1815.

M'Mechen & Sullivan
vs
Maggs

*Martin* for the Appellee, on the *second* bill of exceptions, referred to 1 *Esp. Dig.* 310.

THE COURT agreed with the County Court in the opinions expressed in each of the bills of exceptions.

JUDGMENT AFFIRMED.

DECEMBER.

## M'MEGHEN & SULLIVAN VS. MAGGS.

*A bill filed in chancery by J M stating, that being the owner of a certain number of shares of stock in a bank, on the marriage of her daughter to J L, and with a view to advance him by making him appear to be the owner of those shares, she caused them to be transferred to him in 1805, under a private agreement that she should have the dividends during her life, and if she died before her daughter that the stock was to belong to her daughter, subject to her sole and absolute use and disposal. In 1806 J L, about to purchase a house, and lot solicited J M, to which she consented, that the stock should be sold, to raise money to aid him in paying for the property, he promising to convey it to secure to her and his wife the money the stock should bring, thereby to change her right to the stock into a lien upon the property to an equal amount. The stock was sold, and J L received and applied the proceeds in part payment of*

APPEAL from the Court of Chancery. On the 22d of March 1809, *J. Maggs*, (now appellee,) filed her bill against one *J. F. Levy*, stating, that holding 13 shares of stock in the *Union Bank of Maryland*, and one share in the *Bank of Baltimore*, on the marriage of her daughter *Ann* to *Levy*, and with a view to advance him by making him appear to be the owner of those shares, she caused them to be transferred to him in the year 1805, under a private agreement that she should have the dividends accruing thereon during her life, and upon her death before her said daughter, the said stock was to belong to her said daughter, subject to her sole and absolute use and disposal. That in July 1806, *Levy* being desirous to purchase from one *J. Fowble* a house and lot in *Eutaw street*, in the city of *Baltimore*, the complainant was solicited to give her consent, and she did give her consent, that the stock in the *Union Bank* should be sold to raise money to aid him in paying for the house and lot, he positively promising the complainant to convey and make over the house and lot, to secure to the complainant, and his wife, the money which the stock should bring; thereby agreeing to change the rights of the complainant to the stock, and the dividends thereof, as above set forth, into a lien upon the house and lot to an equal amount, the interest thereon to be paid yearly. That the stock was sold on the 21st of August following, and produced the sum of $1384 50, which *Levy* received, and applied in part payment for the house and lot; and he having fully paid for the same, received a conveyance therefor from *Fowble* on the 22d of August 1806. That *Levy*, although applied to, &c. refused to perform his said promise, &c. And since the death of the said *Ann*, which happen-

the property; and having paid the whole purchase money, received a conveyance therefor in August 1806 J L, though applied to for that purpose. refused to perform his promise, and after the death of his wife, positively refused either to pay the amount of the money produced by the stock, or to give a conveyance on the house and lot—*Decreed*, that J L should pay to J M the sum of money received for the stock, with interest, &c. and if not paid by, &c. the property should be sold, &c. The money not being paid, the property was sold in April 1811, and the sale ratified. Before the sale and ratification, M & S petitioned the chancellor, stating that at the solicitation of J L they had in 1807, 1808 and 1809, endorsed for him sundry promissory notes, under an agreement that if they were not regularly taken up by J L, he would give to them a mortgage on the above mentioned house and lot. That M & S were compelled to take up the notes, and J L in July 1809, executed to them a mortgage of the property, according to the engagement above mentioned. When M & S endorsed the notes for J L, they had no knowledge that any person had any claim, either legal or equitable, on the house and lot. In February 1810, J L gave an absolute deed to M & S for the property. When the mortgage and deed were executed, M and S are supposed to have had knowledge of the lien of J M. J M before filing her bill against J L, brought suit against him at law, and in March 1809 obtained a judgment for the amount of her claim for the stock. M & S, by their petition, prayed a suspension of the sale, &c. The sale was not suspended, but the chancellor intimated that the sale, when made, would be subject to the ratification of this court, and M & S would then be heard, &c. Afterwards he *decreed*, that the petition be dismissed—which on appeal was *affirmed*

ed in December 1808, he had positively denied and refused either to pay to the complainant the amount of money produced by the sale of the stock, or to replace the same, or to give the said conveyance on the house and lot to secure the same, or even to pay the last year's interest due thereon—the former interest being paid by him. That he also refused to make her any satisfaction for the one share of stock in the *Bank of Baltimore*, or to transfer the same to her, or even to pay her the dividends thereon received by him. *Prayer* for a decree to compel a transfer of the one share of stock in the *Bank of Baltimore*, also to cause and procure to be transferred and returned to her 13 shares of the stock in the *Union Bank*, or to secure the payment of the said amount received by him for the same, with interest thereon, by a conveyance and mortgage of the house and lot, &c. Also for general relief. On the coming in of *Levy's* answer, and the return of testimony taken under a commission issued for that purpose,

KILTY, Chancellor, (December term 1810)—*Decreed*, that the defendant should transfer to the complainant one share of stock in the *Bank of Baltimore;* and that he should pay to the complainant the sum of \$1467 57, being the sum received for the *Union Bank* stock, \$1384 50, with one year's interest thereon, and also with interest on the said sum of \$1384 50 from the 22d of March 1809, (being the time of filing the bill,) until paid, and costs. *Decreed* also, that in case the defendant should not pay to the complainant the sum so decreed to be paid on or before the 1st of March 1811, the house and lot in *Eutaw-street*, in the proceedings mentioned, should be sold, &c.

The sum of money decreed not having been paid, the trustee appointed for that purpose made sale of the house and lot on the 1st of April 1811, to *W. W. Taylor*, for the sum of \$5000, which was ratified on the 17th of June 1811. On the 25th of March 1811, *M'Mechen* and *Sullivan*, (the now appellants,) filed their petition, stating that the said *Levy* being seized and possessed of a house and lot in *Eutaw street*, in the city of *Baltimore*, applied to them to advance him a sum of money, or to become his endorsers on certain promissory notes to be discounted at bank, and that the said house and lot should be pledged for such accommodation; and that unless the notes so to be endorsed were regularly taken up by him when required, he would give a mortgage on the house and lot to secure them from loss. That they being thus applied to, and knowing *Levy* to be seized and possessed of the said house and lot, and believing him to be a man of honour, and willing to assist him if secured against final loss, they did agree with him, upon these his proposals, to lend him their names and credit to enable him to engage in business for the support of himself and family, being the objects he stated to have in view, and that they did in 1807, 1808 and 1809,

advance upon their paper and credit to him, the sum of $5000, when they were informed that he could not, on reasonable terms, have an accommodation, in consequence of which, they (being then the makers and endorsers for him of sundry promissory notes,) were compelled to take up the said notes, and to receive from him a mortgage of the said house and lot, which he executed to them on the 8th of July 1809, according to the engagement made by him to them, and on the faith of which they originally became bound for him, and gave him their credit. That at the time they advanced their credit to him, they had no knowledge that any person had, or pretended to have, any claim either legal or equitable on the said lot and premises; and that they would not have accommodated him had they not believed that he had an indefeasible title to the same in law and equity; and that he was able, and would, when required, mortgage to them the same; and that he being unable to pay said advances, afterwards, on the 23d of February 1810, gave an absolute deed to them for said house and lot. That since they accommodated the said *Levy*, a certain *J. Maggs*, (the defendant,) filed a bill against him, setting forth some private claims against him, and insisting that she had, by virtue thereof, some equitable lien against the said property, and has by a decree of this court obtained an order for the sale thereof, and a certain T. B. has been appointed trustee to make the sale, who has advertised the same for sale on, &c. That they were not parties to the said suit or decree, and that *Maggs*, long before she filed her bill against *Levy*, commenced suit against him in *Baltimore* county court, and at March term 1809, obtained judgment against him for the same sum of money, which has been decreed to be paid her by *Levy*, or the said house and lot be sold for the purpose of satisfying the same, and as they understand for the same claim, as will appear by the said judgment, &c. by which they conceive she has made her election, and if she ever had any claim on the said property, that she has voluntarily relinquished the same by the recovery of her judgment in *Baltimore* county court. That if she had not so prosecuted her claim at law, they insist that by the said decree she can have no claim upon the property to their prejudice. *Prayer* for an order to the trustee to suspend the sale; and a *subpena* to *Maggs* and *Levy* to answer, &c. and abide by the further order and decree of this court in the premises. The chancellor did not suspend the sale, stating that the sale when made would be subject to the ratification of the court, and the petitioners might be heard on the subject of their application, according to the notice that would be given. It was agreed that a commission might issue to take the deposition of *Levy* to be evidence in the cause, subject to any legal objection. The answer of *Maggs* stated, that she had no knowledge of any sum of money being due from *Levy* to the petitioners. It stated the bill filed by her against *Levy*, and the proceedings

and decree therein; she admitted a suit was brought by her at law against *Levy*, on the 1st of March 1809, and that judgment was obtained on the 10th of May 1810, for $1448 50, being the amount for which *Levy* had sold the stock mentioned in the proceedings, and some dividends received by him  That she did not relinquish her lien by proceeding at law, and sets out her ignorance upon the subject; but that she did not mean to receive a double satisfaction.  That *Levy* having become insolvent, and the petitioners having obtained a conveyance of the house and lot before mentioned, before the judgment was obtained, she was prevented from and deprived of all benefit of her said judgment or remedy at law.  That *M'Mechen*, one of the petitioners, was informed by her, and others, of her claim upon the property before she had either commenced the said suit at law, or filed her bill in this court.  That he was counsel for *Levy* in both of the said suits, and appeared for him as counsel from the beginning to the end of both suits.  That *Levy* advertised the house and lot for sale on the 27th of June 1809, in one or more newspapers in *Baltimore*, where the parties then and still reside.  That two or three days afterwards, she published in the same newspapers, immediately under *Levy's* advertisement, a caution to all persons not to buy the property, stating her lien, and its prosecution in this court, which advertisements, and their contents, she is well satisfied were seen and known to both of the petitioners when they appeared in said newspapers, and before they took the mortgage from *Levy*.  That the mortgage and absolute deed from *Levy* to the petitioners are fraudulent as to her, and cannot avail to her prejudice, inasmuch as both of the petitioners had knowledge of her lien on the property, when they received said conveyances.  That the petitioners, although informed of the proceedings in this court by her against *Levy*, to enforce her lien, both before and after the mortgage and absolute conveyance, yet the claim they now urge was never made known to this court, nor interposed against her, until after a decree had passed.  Nor did she know or even hear of such claim, until shortly after or at the time she obtained judgment against *Levy*, and it was then through her counsel, on some proposal of compromise.  That knowing that her claim is just and right, &c. she prays that it may be paid to her out of the proceeds of the sale.  Testimony was taken under commissions, and by agreement the testimony taken in the case of *Maggs* against *Levy* was admitted in evidence in this case. The death of *Levy* was suggested.

KILTY, Chancellor, (July term 1812.)  The prayer of the petition was, that this court would order the trustee to suspend the sale until further order, and it is not perceived that any other relief was prayed.  This order was refused, but it was stated that the petitioners might be heard thereafter.  The chancellor is of opinion, on consideration

1815.
M'Mechen & Sullivan
vs
Maggs

of the proceedings and arguments of the counsel, that there is nothing to entitle the petitioners to the interposition of this court. *Decreed*, that the petition be dismissed, but without costs. The petitioners appealed to this court.

The cause was argued before Chase, Ch. J. and Buchanan, Earle, Johnson, and Martin, J.

*Martin*, for the Appellants. The question is, who had the first lien on the house and lot, the appellants or the appellee? He contended that the contract alleged by the appellee was, as to creditors, illegal; that it gave to *Levy* an appearance, without the reality, of property. That if it was valid, yet the appellee was only to have the dividends. the rest of the interest was vested in *Levy's* wife, and as it was personal property, on her death it belonged to the husband. He also contended, that as the appellants were ignorant of any interest the appellee might have had in the property at the time they became endorsors, although they became acquainted with it before they obtained their mortgage and deed, still the mortgage and deed must prevail. That a person who has an equitable right, if he obtains the legal estate, will prevail over a prior equitable right, provided he was ignorant of such prior equity originally, although he may become informed of it before the legal right is obtained. 2 *Fonbl.* 306, 309, *(note e.)* That the appellee made her election to proceed at law, she was therefore precluded from proceeding in equity. Upon the principle of election, if a person has two remedies, one at law and one in equity, if he proceeds at law, he is precluded from going into equity, and so *vice versa.*

*Kell*, for the Appellee. The appellants might have become parties to the original suit, and brought forward their claim. Having neglected to do so, they are now precluded. Their bill only prayed a suspension of the execution of the decree in the former case, and no other relief. The decree in the former case was a proper decree, and cannot be now reversed. The appeal in this case is from the refusal of the chancellor to suspend the sale; and if this court considers that the chancellor did wrong, can they reverse the original decree? The sale was not suspended, but has been made and ratified. Can this court now set it aside? As to the matter of election urged by the appellants, it is answered that they ask the aid of a court of equity to enforce that election, (if it is such,) whilst they have, by the joint act of themselves and *Levy*, the defendant in equity, rendered that election or remedy unavailing, by obtaining the mortgage from *Levy*, the defendant, after the bill was filed, and notice in fact of the appellee's lien— 2 *Fonbl.* 156, 157, *(note)*, 309, 471. To the same objection, and also that insisted on of uniting the junior equity to the legal estate so acquired, it is answered, that the

1815.

M'Mechen & Sullivan
vs
Maggs

bill in the case of *Maggs vs. Levy* seeks no new right—none by the decree could be created. It only enforces the right existing at the time the bill was filed. The decree operating upon the state of things, and rights existing, at the time of the bill filed, has relation back to that period, and binds the parties. Hence the mortgage cannot in equity be viewed as fair and equitable, or the mortgagor and appellants permitted by such means to deprive the decree of its proper office and effect.

*Pinkney*, in reply. The petition in this case contains a prayer for general relief, as well as a suspension of the sale in the case of *Maggs vs. Levy*. This proceeding was not to set aside the decree in that case, which was a good decree as between the parties. The appellants could not interfere with the proceedings in the other case—they were not parties, and it could not injure their rights. A bill of interpleader does not apply to it. It was time enough for the appellants to file an original bill when they found the court was about to interfere with their interest. They did not know that the chancellor would decree a sale. It is every day's practice to suspend proceedings in chancery similar to the suspension of an execution on a judgment at law. It is not to interfere with the decree, but to bring a new case before the court, in which there are different facts, different parties, and different interests. If these interests are good, then the former decree is finally suspended. Notice of *Maggs'* bill does not affect the right of the appellants more than if no bill had been filed by her against *Levy*. A proceeding in a court is presumptive notice, but it never produces any effect except between the parties to the proceedings. 2 *Fonbl.* 156. It could operate no further than express notice, which could not interfere with the appellant's prior equity. If their equity was perfected before the equity of the appellee, then the bill by her against *Levy* does not affect their case. The suit at law was no notice but of what the declaration contained. A bill in chancery is notice of nothing more than what is contained in it. The proceeding at law was negative notice of any equitable claim. By her proceeding at law the appellee elected how she would proceed. How could she proceed at law while the equitable claim remained under the contract she sets out in her bill? Her suit at law demanded a reimbursement of the whole sum. In equity her demands are different. On a disaffirmance of the contract she could proceed at law, and on no principle, but on rescinding the contract, could she proceed at law; and by doing so, she considered the contract as at an end and rescinded, and the money in the hands of the borrower for the use of the lender. *Levy* failed to execute the contract, and she proceeded at law for money had and received. If a suit is brought at law, is not relief in equity given up? Suppose a contract by parol for the sale of land, and the purchase money is paid, but the party refuses to convey.

Here there are two remedies, at law or in equity, to recover back the purchase money, (disaffirming the contract,) or to file a bill to enforce the contract. But if the contract is disaffirmed, and a suit is brought at law for money had and received, the party cannot resort to equity for relief. The party has made his election, and he cannot have both remedies—if resort is had to one, the other is abandoned. When the mortgage deed was executed to the appellants, the appellee had no equitable claim—she had abandoned any she might have had by proceeding at law. She ought to have abandoned her suit at law by a discontinuance when she found *Levy* was insolvent; but instead of that she proceeded to judgment. The stock, while it stood in *Levy's* name, was affected by the appellant's lien. Standing in his name it gave him credit, and any secret contract was fraudulent against creditors. The change to the house and lot did not alter the case. It bettered it, as it was a visible object. There was a legal conveyance to *Levy,* which was recorded, and it was notice to all the world, so that any person was as well justified in crediting him upon the house and lot, as upon the stock. Shall a latent equity be set up to defeat honest creditors? It will not be tolerated that an equity lying hid and in secret, may be brought forward after creditors have lent their money without any knowledge of it. Under a belief of a solid security the money is loaned by the appellants—they are deceived and defrauded The appellee does not deny the facts alleged in the appellant's bill, but puts them upon their proof. *Levy* had no interest, though made a defendant. When he was examined as a witness he had no interest—having been discharged as an insolvent debtor. A defendant may be examined in a cause in equity—one co-defendant may be examined against another. The court may order him to be examined, and if he is disinterested, he is a competent witness. Here there was an agreement to take *Levy's* deposition, and his testimony proves the appellant's equity. To set him up in business the appellants lend him their responsibility. This continued in 1807, 1808 and 1809, by renewal of the notes—*Levy* not being able to take them up. There was notice in 1807 or 1808 of the appellee's equity. In 1809 there was presumptive notice by the bill. The express notice was in June, and the mortgage in July 1809. It must be presumed that all the advances by the appellants were made before 1809. The whole was made in 1807, when *Levy* set up in business; and it cannot be inferred that the advances were made after the notice of the appellee's equity. Their equity was perfected before they had notice of the equity of the appellee.

DECREE AFFIRMED.