THOMAS S. ALEXANDER AND MARGARET A. GHISELIN *vs.* ROBERT GHISELIN AND OTHERS.—*December*, 1847.

Under the act of 1805, ch. 110, and its supplements, the trustee of an insolvent is not restricted in his sales to what he has in actual possession. Property in the hands of a tenant, a bailee, or a trespasser, or mortgagee of more value than the debt, may be sold.

The design of the 7th section of that act was to allow full force and effect to an execution levied, as a lien or incumbrance, in connexion with which words, the process is mentioned, but not to determine nor indicate by whom the sale was to be made.

.The act of 1805 and its supplements, require the trustee to take into his possession all the estate and effects to which the insolvent had *the right of possession* at the time of his application, and to sell and dispose of *all* his property in possession, reversion or remainder, and pay off the liens and incumbrances thereon, and to regard an execution as a lien upon personal property, only in the case where it was actually levied before the insolvent's petition.

In the case of the personal estate, it secures to the execution creditor a priority over all judgments not in the same condition, by making his debt a specific lien on the property seized in execution.

The law has given to the trustee the entire management of the estate, subject to the control of the court by whom he is appointed; charging him with the duty of paying off liens and incumbrances, to which the estate might be subject.

An agreement to mortgage personal property alone, to secure a debt due from the one contracting party to the other, to be performed forthwith, is not affected by the statute of frauds; but if it had also related to land, it would have been within its operation.

An equitable mortgage may be enforced against others than the contracting party.

Alexander et al. *vs.* Ghiselin et al.—1847.

Although the exception in the act of 1729, ch. 8, sec. 5, is broad enough in terms to defeat a *bona fide* purchaser, who has paid his money on the faith of a legal transfer or security, to be forthwith executed, if the rights of a creditor should happen to intervene ; still it is not always to have that construction, but has been so considered in equity, as to avoid many of the inconveniences which a literal interpretation of it would inflict.

A court of equity may specifically execute a contract for a mortgage or other equitable lien against creditors.

The rule that equity regards as done that which was agreed to be done, is part of our law. The instances in which it has been enforced, and against the very terms of the registry acts, are numerous.

A written contract to execute a mortgage, clearly expressed, made *bona fide*, and for full value, raises an equity for the party claiming under such contract, that prevails over the legal rights of creditors.

If a contract be as well established, it imposes the same moral and equitable obligation to perform it when verbally made, as if made in writing, and the legal effect of the terms of the agreement will be the same, in the one case, as in the other.

Courts of equity have properly required, that every agreement should be clearly and explicitly established, before it will lend its aid to enforce it.

G. held a mortgage on real estate, the first incumbrance; she was prevailed on to agree that it should be postponed in favor of individuals, who were expected to loan the mortgagor a further sum of, &c. to pay off and discharge liens on his estate and other debts; on condition that she should receive as additional security, a mortgage on her mortgagor's negroes. Two persons had promised to loan the amount on receiving mortgages, to which hers should be postponed ; and it was expected by all that the required sum would be raised on these terms. The deeds were prepared, as well the mortgages to the persons who were to loan the money, as the mortgage to G. on the negroes. A mortgage to one of the persons who was to loan a part of the money, was also prepared and executed by G. and her mortgagor; but the other who had agreed to loan the balance declined doing so, and the amount was not procured. *Held*, that G. had performed the condition on her part, so far as to be entitled to specific execution of the agreement, to give her a mortgage on the negroes to the extent of the sum borrowed.

In a court of law, a party claiming under a contract must claim according to its terms. If he venture to speculate on a contingency, over which he has no control, he must abide the issue ; and if the event does not occur, as he has assumed, the contract is at an end.

But even at law, if one party be prevented by the other from performing the contract, he can recover from that other, by showing a performance of as much as it was permitted him to perform, and a readiness to perform the residue.

The rule in equity is much more broad, and permits a party specifically to enforce a contract, who has performed so much of it as to incur loss, if he is in no default for not performing the residue.

Another creditor of the mortgagor, participating in the arrangement by which

*G's* first lien was to be waived, and her debt further secured by the lien on his negroes, finding that his claim would be postponed for many years, required of the mortgagor, who agreed, that he should likewise have a security on the negroes. *Held,* that the terms of this agreement were neither vague nor uncertain.

An existing creditor demanding specific security for his debt, and obtaining the promise of the debtor to comply, is to be considered in a court of equity, as favorably as a creditor, who at the moment of becoming a creditor, obtains a pledge for a specific security.

The existence of a debt at law is a consideration for an express promise, equivalent to the advance of an equal amount for the transfer of property, and ought to be a sufficient basis in equity on which to rest an agreement, fair in all other respects, and will sustain an agreement by a debtor to give a specific lien to a creditor.

When a case is before the court on the motion to dissolve an injunction, and on bill and answer, the answers are to be taken as true, so far as they affect the interests of the defendants respectively making them, and so far as they are responsive to the bill; and the statements of the bill are to be received as true, so far as they are not denied.

It is proper as a general rule, very rarely, if ever, to be departed from, that an injunction bond should be required, when an application is allowed that delays the recovery or receipt of money, or which lessens or in any respect endangers any existing securities, or renders liable to loss thereby, any money, profits, or property, which the adverse party is by injunction prevented from receiving or enjoying.

Where a judgment creditor had sued out execution, and levied it upon the personal property of the defendant, who afterwards applied for relief under the insolvent laws, and a trustee was duly appointed, upon a bill filed by other creditors of the insolvent claiming a specific lien by way of mortgage on such property, and the insolvent's trustee, for an injunction to arrest the sale of the property by the sheriff. *Held,* that the complainants were entitled to such injunction, but that a bond should have been filed and approved before it issued.

In general, where an injunction issues without bond, the defendants may petition for an order of court, requiring bond to be given by a reasonable period, or on default, to have the injunction dissolved.

But when the answers have come in, and they show on their face a case for a perpetual injunction, and the continuance of the writ was not dependent upon a question of law or fact to be established, it would be wholly unnecessary to require a bond.

APPEAL from the equity side of *Prince George's* County Court.

The appeal in this case is from an order passed on consideration of bill and answers, dissolving an injunction, which had been granted on the bill, to stay a sale of negroes, under

executions issued out of that court, on judgments recovered against the defendant, *Robert Ghiselin,* in favor of other defendants.

The bill which was filed on the 11th Nov., 1846, states, that a certain *Robert Ghiselin,* is, and at the date of the transactions hereinafter particularly detailed, was largely indebted unto your orator *Thomas,* and especially in the sum of $6000 on his promissory note, for that sum, dated on the 24th February, 1844, as by said note, marked A, and filed as part of this bill will appear; which said debt was chiefly for monies advanced by your orator *Thomas,* to pay judgments against the said *Robert.*   That the said *Robert* was, and yet is indebted unto your oratrix *Margaret,* in the sum of $10,000, besides interest, which was secured by a mortgage of said *Robert's* real estate, now recorded amongst the land records of said county; and a copy whereof, to be marked B, your orators propose hereafter to file as part of this bill.   And that the said *Robert* was, and yet is indebted unto divers other persons, in large sums of money, which are secured by judgments, entered up in *Prince George's* county court against him.   That sometime in the spring of 1845, the said *Robert* proposed to borrow from certain *Thomas Edmonson* and *John Glenn,* the sum of $15,000, with which he proposed to pay off and discharge the liens on his estate, other than his debt due to your oratrix *Margaret ;* and also to retire certain paper, on which your orator was liable, as endorser, and accepted for him.   To effect this object, it was necessary that the incumbrance held by your oratrix *Margaret,* should be postponed in favor of the individuals who were expected to make such advances; and your oratrix *Margaret,* who is the mother of the said *Robert,* was therefore prevailed to agree, to waive or postpone her said incumbrance for such purpose, on condition, that she should receive an additional security, by way of mortgage of the said *Robert's* negroes. And your orator *Thomas,* who was privy to, and participating in the arrangements aforesaid, finding that payment of any part of his large claim would necessarily be postponed for many years, required, and upon his requisition, the said *Robert*

agreed, that your orator should likewise have a security and indemnity upon said negroes. And your orator *Thomas*, there- fore, at the request of the said *Robert*, prepared first, the draft of a mortgage, from the said *Robert* to the said *Edmonson*, to secure payment of the sum of seven thousand dollars, or there- abouts, in which your oratrix *Margaret* was to unite as a party, for the purpose of waiving her aforesaid incumbrance, in favor of the said *Edmonson*. In the next place, a draft of a like mortgage, from the said *Robert* to the said *Glenn*, to secure the payment of the sum of eight thousand dollars, or thereabouts, on which a like agreement was to be made by your oratrix *Margaret*, for postponing her lien in favor of said *Glenn*. And lastly, by a draft of a bill of sale, by said *Robert* to your orators, of his stock of negroes, to secure their claims as aforesaid. That the draft first within described, is now in possession of said *Robert;* that the second is now in the office of the clerk of *Prince George's* county, deposited for record, and having been executed, under the circumstances hereinafter detailed; and the last was lately re-delivered by said *Robert* to your orator, and is marked C, and filed as part of this bill; and your orators pray leave to file a copy of the deed, from said *Robert* to said *Glenn*, as a part also of this bill. That at the time of making the aforesaid agreement, and of preparing the drafts aforesaid, they had no notice whatever of the insol- vency of the said *Robert*, nor any reason for believing that he was in fact insolvent, or designed or contemplated an applica- tion for the benefit of the insolvent laws; and consequently, there was not, and could not have been any intention on the part of any of the parties, to give an undue and improper pre- ference to your orators. On the contrary, the said *Robert* assured them, (and they believed said assurances,) that his debts did not exceed the sum of $40,000, whilst his property, if sold at any time, would yield $60,000 at the least; and it was from their confidence in the truth of such statements and assur- ances, that your oratrix *Margaret* consented to waive her lien as aforesaid; and your orator *Thomas* failed to require a more available security. And your orators further charge, that at

the time of the agreement aforesaid, the only security held by your orator *Thomas*, consisted of a claim, or part of a claim, assigned by one *Robert Bowie* to the said *Robert Ghiselin*, to reimburse monies, which the said *Ghiselin* had been, before that time, compelled to pay, as surety for the said *Bowie*, to extent of two thousand dollars, or thereabouts; and which monies had been borrowed by the said *Ghiselin*, from your orator *Thomas;* and it had been therefore agreed, between the said *Ghiselin* and your orator *Thomas*, that the proceeds of said claim, when collected, should be paid over to your said orator *Thomas*, in payment of so much of his claim against the said *Ghiselin;* and in confident reliance on the said agreement, your orator *Thomas* consented, that the judgment which had been recovered against the said *Ghiselin* as surety for said *Bowie*, and on which the payment aforesaid was made, *should be entered satisfied.* And your orators further charge, that the aforesaid drafts, as soon as prepared, were delivered to the said *Robert*, with the distinctly expressed understanding amongst the parties aforesaid, that whenever, and so soon as your oratrix *Margaret* should execute the mortgage and agreement aforesaid, the said *Robert* should and would execute the aforesaid bill of sale; so that they might be, at one and at the same time deposited for record. And your orators further show, that the completion of the agreement and arrangement aforesaid, was delayed from time to time, because of various circumstances connected with the title of the said *Robert*, until in or about the month of September, 1845, at which time, misfortunes, which had most unexpectedly involved several of his friends, admonished your orator *Thomas*, of the impropriety of suffering his large claim to remain unsecured; and he therefore addressed himself to the said *Robert*, urging his right to a sufficient and available security, for payment of his aforesaid claim; and in return, he received from the said *Robert* a letter marked D, and filed as part of this bill; wherein the said *Robert* expresses his belief, that he would be able to settle his affairs; and promises, and engages, in case he should be disappointed in this expectation, to secure your orator *Thomas*

amply.   At this moment, your said orator had no notice of the insolvency of the said *Robert*, or of the extent of his liabilities; and being a brother-in-law of said *Robert*, could not do otherwise than acquiesce in the wish expressed by the said *Robert*, that your said orator would allow some further time for making a settlement of his affairs.   But your orator confidently expected, that so soon as the said *Robert* should have accomplished his proposed arrangements, or should have discovered his inability to effect them, he would have prepared and sent to your said orator the security he had promised ; and in this expectation and confidence, shortly after the receipt of said letter, he permitted the said *Robert* to receive the money collected on the assignment, made by *Robert Bowie* as aforesaid, and appropriate the same to the payment of judgments outstanding against him, and to enter up satisfaction of said judgments.   And your orator *Thomas* further avers, that lately, and after the negotiations of the said *Robert*, for raising money as aforesaid, had entirely failed, he again applied to the said *Robert* to make unto him the promised security ; but the said *Robert* now alleged, that he was insolvent, and contemplating, as probable, an application for the benefit of the insolvent laws, any security given to your said orator as aforesaid, would be an undue and improper preference; and since that time, the said *Robert* has applied for the benefit of the insolvent laws, and your said orator has been appointed his trustee, and has bonded as such.   But your orator charges, that at the times of the aforesaid oral and written agreements, between the said *Robert* and your orator *Thomas*, there was no law to prevent the giving of security, at the solicitation of a creditor; and that your orator, by relinquishing his right, to receive a large sum of money on account, and in faith of the agreement aforesaid, is purchaser of the benefit thereof, for a valuable consideration, and that down to the time of the application of said money, and for months thereafter, he had no notice whatever of the insolvent circumstances of said *Robert,* and did not imagine it was, or would become necessary for him to seek relief from the insolvent laws.   Now, your orator herewith exhibits a state-

ment of his claim for money due him, marked **E**, and prays the same may be taken as part of this bill. He is unable at this moment, to prepare a schedule of his liabilities, for the said *Robert;* but will do so in the progress of this suit. And your oratrix *Margaret*, further charges, that shortly after the agreement aforesaid, first herein before mentioned, and the preparation of the drafts aforesaid, the said *Robert* presented to your oratrix *Margaret*, the draft secondly within mentioned, being the draft intended for the benefit of the said *Glenn*, and desired your oratrix to execute and acknowledge the same, which your oratrix accordingly did, and the same has been placed in the office for record, and herewith your oratrix files a copy, marked **F**, and prays it may be taken as part of this bill. Your oratrix avers, that at the time of executing and acknowledging said deed, she verily believed, and chiefly from the fact, that it was in the hand-writing of your orator *Thomas*, and one of the very drafts prepared by him as aforesaid, that it was to be made under the agreement aforesaid, and had no doubt that the said *Robert*, (who is her eldest child, and to whom she has at all times entrusted the management of her affairs,) would have immediately executed, and placed on the record a bill of sale of his stock of negroes, to your orators as aforesaid, and from her very great confidence in him, has always believed it was so executed until within a very few days last past, when she discovered it had not been done. Your orators have no doubt, that the failure of said *Robert* to execute said bill of sale, proceeded from his hope, that he would succeed in procuring the balance of the sum required, to relieve him from *embarrassment*, and his belief, that it would be in time to execute the said bill of sale thereafter; and they are advised, that they cannot be injured by his delay as aforesaid, but that they are purchasers for a valuable consideration, and as such, are now entitled to full indemnity, out of the stock of negroes agreed to be conveyed to them as aforesaid.

And your orator *Thomas* further charges, that before the application of the said *Robert* for the benefit of the insolvent laws, and before your said orator had any notice whatever, of

19    v.5

the execution of the deed from the said *Robert* and your oratrix *Margaret*, to the said *Glenn*, he prepared the draft of a bill in equity, to be laid before your Honors, claiming for himself, as sole complainant, the benefit of the aforesaid agreements, and laid the same before eminent counsel, residing in the city of Baltimore, for advice; and by said counsel, was advised to file the same in this court; but before said application, conversing with a friend who had far better opportunities of knowing the extent of the said *Robert's* pecuniary embarrassments, on the subject of said claim, he was assured that your orator *Thomas'* loss could not exceed one thousand dollars; and to save such sum, his said friend, and your said orator, both concluded it was not expedient, under the circumstances, to insist on his equities aforesaid. And your said orator was the more readily induced to act on this suggestion, as he believed he would have the opportunity of prosecuting his claim for a priority, on the distribution of the proceeds of sales in insolvency, in case it should turn out that the deficiency in the value of the estate should prove greater than was anticipated. And your orator *Thomas* admits, on several occasions he had stated, that he would not litigate his aforesaid claim in equity, against the general creditors of the said *Robert*, many of whom were his personal and intimate friends, in order to save a thousand dollars, or such sum; and he avers, he is yet unwilling to prosecute a claim to any priority over said creditors, for the sake of one, or even two thousand dollars; but that he has been induced to depart from his aforesaid intention, to withhold his claim until the estate was about to be distributed in insolvency, from his conviction, that the loss to the general creditors must be far greater than was originally anticipated; and that their losses are to be aggravated by the efforts now making by judgment creditors of the said *Robert*, to force a sale of his negroes, under executions. And furthermore, your said orator now has great reason to apprehend, and verily fears, that the security of your oratrix *Margaret* is endangered by the execution of the mortgage of the said *Robert* and *Margaret*, to the said *Glenn*, and the failure of the said *Glenn* to place

the said mortgage on record, until within a few weeks, last past; and being the son-in-law of said *Margaret*, and having been influential in prevailing on her to assent to the arrangements proposed, for relief of said *Robert*, he has deemed it his duty to make a timely effort to vindicate her claims; and he is advised, that a failure on his part, to claim the benefit of an agreement, made for their common security, whilst he was asserting her right to the benefit thereof, would have an unfavorable influence on a future application, on his part, to enforce the same, for her protection.

But now, so may it please your Honors, certain creditors of the said *Robert*, that is to say, *Michael B. Carroll, Thomas Holland, &c., John Glenn, John W. Walker, John Edward Bird*, and the *President, Directors and Company of the Farmers Bank of Maryland*, having recovered or purchased up judgments against him, as by short copies thereof, marked G, and filed as part of this bill, appears, have issued their executions, and seized said negroes, or some of them, and are now about to have them sold for their judgments, as aforesaid. Whereas, your orators are advised, that by force of the appointment and qualification of a trustee, for the benefit of the creditors of said *Robert*, the said executions were so far superseded as to vest the property and possession of said negroes in the said trustee, to be sold by him; and your orators hereby consent, that said trustee may sell and dispose of said negroes, and that the proceeds of such sales may be disposed of by your Honors in equity, or in insolvency, according to the just rights of all the claimants thereof; or, if this cannot be done, then your orators insist upon their equity, to a specific performance of the aforesaid agreement, and a consequent sale of said negroes, or such part thereof as may be necessary, for satisfaction of their aforesaid claims; or, in the event, that said judgment creditors have, in the estimation of this court, acquired any priority over said orators, then they insist that they ought to be entitled to the benefit of the liens of said judgments, as against all other property of said *Robert*.

To the end therefore, that the defendants hereto, may an-

swer the several matters and things herein before charged; and that your orators may have such relief in the premises as their case may require, and in the mean time, that the said judgment creditors may be enjoined from all further proceedings on their executions aforesaid, against the aforesaid negroes; may it please your Honors to grant unto your orators the writ of injunction against the said *Michael B. Carroll, &c. &c., John Glenn,* and the *President, Directors and Company of the Farmers Bank of Maryland,* commanding and strictly enjoining and restraining them, and every of them, from proceeding further with their aforesaid executions, until the further order of this court. And also, the writ of subpœna to the said *Robert Ghiselin* and *Michael B. Carroll, &c.*

Exhibit A, is the original promissory note of *Robert Ghiselin* to *Alexander,* dated 24th February, 1844, for $6,000, with interest.

Exhibit B, is a copy of the mortgage from *Robert Ghiselin* to *Margaret A. Ghiselin,* dated 25th November, 1834, of all the mortgagor's real estate, to secure the payment of ten thousand dollars, with interest.

Exhibit C, referred to in the aforegoing bill :—

Whereas, *Robert Ghiselin,* by his certain indenture of mortgage, dated on the 25th of November, 1834, did convey unto *Margaret Ann Ghiselin,* of said county, certain real estate in said county, in order to secure to her the payment of the sum of ten thousand dollars, current money, and interest as in said indenture is more fully expressed. And whereas, the said *Margaret Ann Ghiselin,* at the instance and request of the said *Robert Ghiselin,* hath agreed to waive her priority of lien on said premises in favor of certain *Thomas Edmonson* and *John Glenn,* and to enable him the better to secure the payment of large sums of money now due and owing from him unto them. And whereas, the said *Robert Ghiselin* is also indebted unto *Thomas S. Alexander,* in the sum of six thousand dollars, current money, besides interest on the promissory note of said *Robert Ghiselin,* for said sum, dated on the twenty-fourth day of February, in the year eighteen hundred and

forty-four. And the said *Thomas S. Alexander* is also liable as endorser of promissory notes of the said *Ghiselin*, discounted at *The Farmers Bank of Maryland*, for his accommodation. Now, know all men by these presents, that the said *Robert Ghiselin*, for the purpose of securing, in the first place, unto the said *Margaret Ann Ghiselin*, the payment of the sum of money so as aforesaid due and owing unto her, and interest thereon. And secondly, unto the said *Thomas S. Alexander* the payment of the sum of money, so as aforesaid due and owing unto him, and interest thereon. And also, lastly, to indemnify the said *Alexander* against all, and all manner of liabilities which he may have heretofore assumed, or hereafter may assume, on account of the said *Robert Ghiselin*, and in consideration of the sum of one dollar, current money, to him in hand paid by the said *Margaret Ann Ghiselin* and *Thomas S. Alexander*, at or before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, hath granted, bargained and sold, and by these presents doth grant, bargain and sell unto the said *Margaret Ann Ghiselin* and *Thomas S. Alexander*, their executors, administrators and assigns, all and singular the negro slaves of him, the said *Robert Ghiselin*, and now in their possession, with their and every of their increase, to have and to hold the aforesaid negroes, with their increase unto, and to the use of the said *Margaret Ann Ghiselin* and *Thomas S. Alexander*, their executors, administrators and assigns; provided, nevertheless, that if the said *Robert Ghiselin*, his executors or administrators, shall well and truly pay unto the said *Margaret Ann Ghiselin*, her executors, administrators or assigns, the aforesaid sum of ten thousand dollars, current money, with interest thereon, according to the tenor and effect of the indenture of mortgage herein before recited, and shall also, whenever he or they shall be thereto hereafter required, well and truly pay unto the said *Thomas S. Alexander*, his executors, administrators or assigns, the aforesaid sum of six thousand dollars, with interest thereon from the date of said note; and indemnify the said *Alexander*, his executors and administrators, from all damage on account of

his liabilities assumed, or hereafter to be assumed, for and on account of the said *Robert Ghiselin*, then these presents and every thing herein contained shall be void, and of none effect. In witness whereof the said *Robert Ghiselin* hath hereto set his hand and seal, this —— day of June, in the year eighteen hundred and forty-five.

This paper was not executed by *R. G.*

Exhibit D, referred to in the aforegoing bill :—

OCTOBER *3rd*, 1845.

DEAR SIR,—Having intended up, I delayed answering your letter received some days since, as I thought we could talk the subject over, and I could express myself more fully than by letter. The subject has indeed been most harrowing to my feelings, particularly as I find you feel some apprehensions about the safety of my debt to you. I do not anticipate any immediate executions against my property, and do hope yet to force *Robert Bowie* to do something for me. I shall adopt a plan which I feel confident will do it. You shall certainly be made secure, when I find that I shall fail to make my negotiation; but a bill of sale to you at this time, while this matter is still open, would prove most ruinous to me, otherwise I should not hesitate a moment about it. You should however feel easy about it; for my property at but a moderate price would far exceed my debts. This however we can talk about when I see you. I hope you will not express to any one at present, any apprehension about my failing in my negotiation, otherwise it might hasten executions, which I have assurances will be delayed until I can do something. Our love to all.

Yours truly,      ROB'T GHISELIN.

To THOMAS S. ALEXANDER, Esq., *Baltimore.*

Exhibit E, is the account of the claim of the complainant, *Alexander* against *R. G.*

Exhibit F, is the mortgage from *Robert Ghiselin* to *John Glenn*, dated 10th June, 1845, of his real estate; to secure the payment to *Glenn* of $8056,30, with interest. *Margaret Ann Ghiselin* unites in this mortgage, for the purpose of

waiving "her priority of lien on the aforesaid premises, in favor of the said *John Glenn*."

The injunction was accordingly ordered and issued, and being served on the sheriff, the negroes were delivered over to the complainant, *Alexander*, as insolvent trustee.

The separate answer of *Robert Ghiselin* to the bill of complaint of *Margaret A. Ghiselin* and *Thomas S. Alexander*.

This respondent, now, &c., for answer, says: that it is true, he was at, or about the time stated in said bill of complaint, largely indebted to the complainant, *Alexander*, and to the amount stated by him, a large part of which indebtedness was created by borrowing money, to pay off judgments against the respondent; and he also admits his indebtedness to *Margaret A. Ghiselin*, the other complainant; and he also admits his indebtedness to various other persons, by judgments, as stated in said bill. Further answering, he admits, that in the spring of 1845, he proposed to borrow of *Thomas Edmonson* and *John Glenn*, the sum of fifteen thousand dollars, to pay off all the judgments against him, and the mortgage held by *Farmers Bank of Maryland*, of which he did procure from said *John Glenn*, upwards of eight thousand dollars; and this respondent admits, that he proposed to said *Margaret A. Ghiselin*, that if she would agree to postpone her lien upon his lands, so as to enable him to raise said money, he would give her as additional security for her debt, a lien on said negroes; and he further admits, that the said *Alexander* proposed, and this respondent agreed, to give him also a lien on his negroes, as security for his debt, after such fifteen thousand dollars should be raised and received as aforesaid; but he denies that he ever agreed to give such mortgage to the prejudice of the then existing judgment creditors, because it was understood by complainants, as well as respondent, that these were to be first provided for, from said sums of money; and he admits, that the various papers, as stated by said complainants, were prepared by said *Alexander*, at the request of said respondent, and sent to said respondent for execution; two of them only were executed, that is, the mortgage to *Glenn*, and the mort-

gage to *Edmonson*, the mortgage to *Glenn* only having been delivered, the other was cancelled, the said *Edmonson* not having advanced the amount which the respondent expected to receive from him. And this respondent admits, that said papers, except the mortgage to *Glenn*, always remained in his possession, until written for last fall, by said *Alexander*, when the paper prepared as a mortgage to himself, and *which was not executed by said respondent*, was returned to him by said respondent. And he freely admits, that when these transactions occurred, he had no intention, or expectation of being or becoming an insolvent debtor, but really believed himself able to pay all his debts. He further admits, that said *Alexander* held as his only security for his debt, a claim on *Robert Bowie*, as stated in said bill, the proceeds of which claim were afterwards appropriated by the respondent, as stated in said bill; and he further states, that he does not recollect, that there was any understanding, that said papers should all be executed at the same time; although he does remember, that no mortgage was to be made to his mother, or said *Alexander*, until the mortgage to *Glenn* and *Edmonson* were first made, in order to pay off the said judgments.

This respondent further answering, admits, that having received from said *Alexander* a letter, dated September, 1845, which has been mislaid, he wrote the reply thereto, filed in the said bill. He admits the final application for security, as alleged in said bill, and his refusal to make the same; and he also admits his application for the benefit of the insolvent laws, and the appointment of said *Alexander* as his trustee; and he admits the levy of execution, as stated in said bill.

The joint and several answers of *Henry J. Harrison, John W. Walker,* and others, stated, that they are judgment creditors of the defendant, the said *Robert Ghiselin*, for the several and respective amounts, shewn and indicated by short copies of said judgments, filed with the said complainants' bill, marked exhibit G; that some of their said judgments were recovered in eighteen hundred and forty-three and four, as appears from said exhibit; no part of which has been paid them by the said

*Robert Ghiselin,* but the whole amount thereof is still due and unpaid, that they issued executions on said judgments, respectively, returnable to the *April* term of *Prince George's* county court, eighteen hundred and forty-six; but they were not levied upon the property of the said *Robert;* that executions of *fieri facias* were renewed thereon, and were issued from said court on the 28th July, 1846. And all of them were levied upon the negroes and personal property of the said *Robert,* as stated by the complainants, on the 29th July, 1846, long before the application of the said *Robert Ghiselin* for the benefit of the insolvent law of the State, which application was not made until the ⎯ day of October last past.

These respondents admit, that the said *Robert Ghiselin* has petitioned for relief under the insolvent laws of the State, as stated by the complainants; and that the said *Thomas S. Alexander* has been appointed his trustee, and bonded as such; and received a conveyance of said insolvent's property as trustee; but these respondents are advised and insist, that his application for the benefit of the insolvent law, and the appointment and qualification of the said *Alexander,* as his trustee, does not supersede or suspend the executions of these respondents, which were issued and levied antecedently to the said application; or in any manner interfere with or impair their right to proceed at law with their executions, and to reap the fruits thereof, by a sheriff's sale of the negroes and property seized and levied upon as aforesaid. These respondents further answering, say, that they know nothing of the indebtedness of the said *Robert Ghiselin,* to the said complainants, or either of them; that they are ignorant of any arrangements or agreements, as stated in the complainants' bill, between the said *Robert Ghiselin* and the complainants, or either of them, in regard to the securing their said mentioned debts, by conveyance in the nature of a bill of sale or mortgage, or in any other way; and they are advised and insist, that even if there were made between the said parties, any such agreements, promises and arrangements, they were secret and private contracts, assurances and agreements, that ought not to receive

countenance in a court of equity, against *bona fide* creditors; and especially against creditors of the grade of these respondents, whose executions are actually levied before the filing of the complainants' bill.

These respondents further answering, say, that the collection of their said claims on judgment, and the management thereof, was committed to their respective attorneys; and they are informed by them and believe, and they therefore aver, that after said judgments became ripe for execution, they would have ordered executions thereon, with a view to enforce the collection of their debts, but for the repeated assurances of the said *Robert,* that the said *John Glenn* and *Thomas S. Alexander* were making arrangements in *Baltimore* for a loan for him, for about fifteen thousand dollars, with which their said judgments were to be first paid and satisfied; and in consequence of these assurances, and at the repeated requests of the said *Robert,* they forbore to press the recovery of their said debts. And your defendants state, that it was known to the said *Thomas* and *Margaret,* that the defendants were indulging the said *Robert,* under the belief and expectation that the said loan would be made, and their said debts paid thereby; and these defendants aver, that this expectation alone prevented them from causing executions to be issued on their said judgments, and levied long before the time they were issued and levied, as aforesaid. And they also state, that their said counsel did not know that said negotiation had failed, until the month of July or August, 1846; but during all this time their said counsel believed, that the said negotiation would succeed, and the said debts be paid, as they had been so often assured. These respondents further answering, are advised and insist, that all of said agreements, contracts, arrangements and promises, mentioned in the said bill, as having been made and entered into between the said complainants, and the said *Robert Ghiselin,* about the securing of the debts of the said complainants, by conveyances, as mentioned therein, and all the other promises between the said parties stated in the said bill, if such were ever made and entered into, (and about all of which these respondents are totally ignorant,)

are void and inoperative in law, the same not being in writing, under the statute of frauds and perjuries, which is pleaded to the same by these respondents, and relied upon to defend the same, and by way of defence. And these respondents jointly and severally plead, by way of defence to said promises, agreements and contracts, the statute of 29th *Charles* 2, chapter 3, commonly called the statute of frauds, and insist that the said promises and agreements are all void, under the said statute.

These respondents further answering, state, that the said promises and agreements, if ever made to the said complainants by the said *Robert*, from the very terms of them, as appears from the complainants' exhibit of a letter from the said *Robert*, and from the averments of the said bill, *were entirely conditional* and were not to have been carried into effect, unless the said *Robert* succeeded in raising a sum of money by a loan sufficient to relieve him from his embarrassments, and especially from these respondents' judgments, and which he failed to do; the promises were therefore dependent upon a contingency which did not occur, and cannot be enforced even against the said *Robert*. These respondents further answering, insist that the complainants should have given an injunction bond, and they insist the injunction should not have been granted, without bond, in pursuance of the law, and as in duty bound they will ever pray, &c.

The answer of *John Glenn* admitted, that the exhibit A, of complainants, is the promissory note of his co-defendant, *Robert Ghiselin*. He knows nothing of the other particulars of the claim of the complainant *Alexander*, against the said *Robert*, but refers to, and is willing to adopt the answer of the said *Robert*, so far as it relates to the origin, amount and condition of said claim. This defendant also admits, that the said *Robert* was and is indebted unto the complainant *Margaret*, in the sum of ten thousand dollars, with interest; the payment whereof is secured by mortgage, as is more fully stated in said bill. He also admits, that the said *Robert* was indebted unto the *Farmers Bank of Maryland*, in the sum of four thousand dollars, and interest on a mortgage, which con-

stituted *the first incumbrance on his lands;* and also to divers other persons, on judgments recovered against him, and being so indebted, the said *Robert,* in the spring of the year eighteen hundred and forty-five, applied to this defendant, to procure for him a loan of fifteen thousand dollars, to be applied to the discharge of all the incumbrances on his lands, other than the mortgage of the complainant *Margaret,* his mother. That this defendant examined into the state of affairs of the said *Robert,* because convinced that fifteen thousand dollars was sufficient to relieve the said *Robert,* as aforesaid. And therefore agreed to advance the sum of eight thousand dollars, and entered into a treaty with one *Thomas Edmonson,* for an advance by him of the remaining seven thousand dollars. But the said *Edmonson,* and this defendant, required as a condition, on which their advances were to be made, as aforesaid, that the complainant *Margaret* should agree to waive or postpone the lien of her incumbrance in their favor; and it became necessary to call in the assistance of the complainant *Alexander,* her son-in-law, to explain the circumstance to her, with its probable consequences. And through his intervention, it was agreed, as this defendant heard at the time, both from the said *Alexander* and the said *Robert,* that the said *Margaret* should waive the lien of her mortgage to the above mentioned extent, and in consideration thereof, should receive an additional security, by mortgage of the negroes of the said *Robert.*

This defendant cannot undertake to answer, whether he had or not any notice of any proposed security to be given to the said *Alexander.* But it was understood at the time, by all parties, that the requisite instruments of writing, were to be prepared by the said *Alexander;* and confiding in the information given him at the time, and since, by the said *Robert,* he has no doubt, and admits, that the instruments described in the bill, as intended for the security of this defendant, of the said *Edmonson,* and of the complainants, were prepared, as is stated in the bill, he refers to the answer of *Robert Ghiselin,* which he makes part of this, whether the said *Alexander* was, by agreement as aforesaid, to receive the security, which the

last described instrument professes to give him. And this defendant admits, that it was understood and expected by him, and he supposed by all the parties, that the aforesaid mortgages would have been executed and delivered as soon as they were prepared; and that when the said *Margaret* parted from her lien on the real estate, she was at once to have received the additional security, proposed to be given by mortgage, of the said *Robert's* negroes. And this defendant, in fact, did shortly thereafter receive the mortgage to himself, as is stated in said bill; and did thereupon advance the sum of money therein mentioned, which was applied in payment of judgments and other claims.

That the said *Edmonson* declined to advance the money promised by him, because of an outstanding judgment, recovered against the said *Robert*, as surety of one *Robert Bowie*, and after many delays the negotiation with him was broken off. This defendant further admits, that the complainants' exhibit D, is in the hand-writing of the said *Robert*, and was written by him at the time, and under the circumstances mentioned in said bill. This defendant has been informed by the said *Robert*, and therefore admits, that at the time of the original agreement, the said *Alexander* held an assignment made by one *Robert Bowie*, to the said *Robert Ghiselin;* and that in reliance on the security, to be acquired under the proposed arrangement, he permitted the said *Ghiselin* to receive and apply the money arising on said assignment, to the payment of judgments against him.

This defendant admits, that throughout the year 1845, and until the summer of the year 1846, the said *Robert* was believed to be solvent, and able to pay his debts. He further says, that at the last mentioned date, he had reason to suspect the insolvency of the said *Robert*, and therefore caused writs of *fieri facias* issued on judgments held by him, as stated in the bill, and that the same were laid on the negro slaves of the said *Robert;* and this defendant is advised and insists, that by reason of the levy aforesaid, he has acquired a lien on said negroes, which is to be preferred to the claims of the com-

plainants in said bill; and he further relies and insists on the defences afforded by the statute of frauds, as a complete bar to the relief prayed by said bill, and prays that the injunction heretofore granted on said bill, may be dissolved, and he may be dismissed with costs, &c.

The cause was then submitted on a motion made by defendants, for a dissolution of the injunction, and by an order, dated 23rd April, 1847, the court (KEY, A. J.) dissolved the injunction.

The complainants appealed from this order of dissolution.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE and MARTIN, J.

By ALEXANDER for the appellants.

The appellants insist that the order dissolving the injunction is erroneous, and that the injunction ought to have been continued.

1st. Because the appointment and qualification of the said *Alexander* as trustee of *Robert Ghiselin*, on the application of the latter for the benefit of the insolvent laws, superseded the executions of the defendants, and vested in him the property which had been taken in execution.

2nd. Because the agreement mentioned in the bill is a valid agreement, and proper to be enforced in equity; and therefore the complainants are entitled to satisfaction of their demands out of the proceeds of sales of the negroes in question, even to the prejudice of the creditors claiming under the aforesaid executions.

3rd. It will be insisted further, that if the execution creditors should appear entitled to a preference over the complainants, the benefit of the injunction ought to be sustained so far as to prevent any further proceeding on the writs of execution; and that the remedy would be by a declaration that the execution creditors are entitled to a preference in the distribution of the funds in the hands of the insolvent trustee, to be administered in insolvency, and that the complainants shall

be subrogated to the rights of the execution creditors, so as to entitle themselves to the benefit of the lien of the judgments and executions against other property of the insolvent, which may be liable therefor.

It is objected that the injunction issued without a bond. It was ruled by Chancellor Johnson, many years ago, that a stranger to a judgment, seeking to enjoin it, need not give bond. He claims under a mere equitable title. The practice is uniform. The complainant here is under no personal obligation to pay the debt. *The Cape Sable Co's case,* 3 *Bland,* 615. 1835, *ch.* 346. *Alex. Prac.,* 81, 82. *Jones vs. Magill,* 1 *Bland,* 194, *note.*

If the objection is valid, there should have been a rule requiring bond by a given day. The injunction should not have been at once peremptorily dissolved.

The subject of the agreement here is not land, but personal property. Under the statute of frauds, it is objected that the promise relied on in this case was not to be enforced within a year. But that statute only applies where it appears that the agreement was not to be performed within the year. If the contract is in the alternative, it is not within the statute. Here a speedy execution of the agreement was contemplated. Both *Glenn* and *Ghiselin* so designed. The papers are dated in June, 1845; no proof of postponement to end of a year. But the statute is no bar in this case. *Jones vs. Hardesty et al,* 10 *G. & J.* 404.

The act of 1805, ch. 110, sec. 5, 7, superseded the executions issued by the creditors of *Ghiselin,* upon his application for relief under the insolvent laws. The property was vested in his trustee, who is bound to pay all liens, judgments and incumbrances. The act determines what judgments are liens as to lands; as to personal property to create a lien, the execution must have been levied. The general property is in the trustee. The specific property in the lien creditor. A trustee is appointed that there may be a jurisdiction to administer the fund. This operates a supersedeas of the execution and transfer of the property by the policy of the law to the trustee.

He is authorized to sell for the benefit of all. Creditors rely on their priorities. The appointment of the trustee does not determine the lien absolutely, but only *sub modo*. It restrains the sheriff. There is convenience in the rule. This renders a dissolution of the injunction in this case unnecessary. Under the act of 1799, on injunction, the property goes back from the sheriff to the trustee, who has the general property. It could now only be reached again by a new fieri facias; yet in the hands of the trustee, this is prohibited by the act of 1805, ch. 110.

Upon the 2nd point: Could the agreement for a lien been enforced against the original parties? *Mrs. Ghiselin* was an incumbrancer with sufficient security. On the property secured to her it was proposed to borrow $15,000. She was satisfied with this. She was solicted to postpone her rights. She believed that $15,000 would relieve her son from embarrassments. If she would agree to postpone her rights, she was to have *additional security* on her son's negroes. Additional security for the relinquishment of a part of prior security, is a good consideration between the parties. She let in *Mr. Glenn* to a preference. She agreed to do the same as to *Edmonson*. This entitled her to the additional security. *Mr. Glenn* advised this course after examination into *R. G's* affairs. He complied; *Edmonson* refused; that part failed. The additional security may avail to the extent of the injury. *Mrs. G's* part was special and limited in its character. It was to be concurrent with acts of other parties. There was a clear execution of the contract on her part. *Alexander* was brought in to induce him to aid the execution of *Mrs. G's* contract, new incumbrances were to be created on lands and negroes. He demanded a second security on the negroes, before he proffered his aid. He had no knowledge of *Ghiselin's* situation. There was nothing to prevent his exacting security. The proof is in exhibit C; this was prepared by *Alexander*. It imports an agreement. He was not to do any thing, but he was to be secured with *Mrs. G.* There is no necessity for a new consideration between debtor and creditor. *Alexander*

agreed to postpone his claim for some years. It was no part of his duty to raise the $15,000. His duty was only to postpone his claim.

Equity considers as done what ought to be done. A vendor is a trustee for his vendee. The right to a conveyance may be asserted against the vendor or his heirs. A purchaser for value without notice is the only exception to this rule. 2 *Sto. Eq.* 959, *sec.* 1502. The purchaser must be *bona fide,* and must have paid the purchase money. The equity of vendee for value, is superior to that of judgment creditors claiming under judgments subsequent to the agreement. *Finch et al. vs. Earl Winchelsea,* 1 *P. Wms.* 277, 278. *Hampson vs. Edelen,* 2 *H. & J.* 64.

The equity of vendor for unpaid purchase money, is enforced against the judgment creditor and assignee of the vendee. *Repp et al. vs. Repp et al.,* 12 *G. & J.* 344. *In the matter of Howe,* 1 *Paige N. Y. Eq. R.* 125.

Mortgage defective for want of enrolment established against a judgment creditor. *Taylor vs. Wheeler,* 2 *Vernon,* 564.

A defective mortgage made in consideration of giving up another security enforced against parties. *Tiernan vs. Poor & wife,* 1 *G. & J.* 206. *Brundige et al. vs. Poor & wife,* 2 *G. & J.* 1. *Woods vs. Fulton & Starck,* 4 *H. & J.* 329. *McMechen & Sullivan vs. Maggs,* 4 *H. & J.* 132.

An agreement to mortgage will be enforced against a prior judgment creditor, with notice before purchase. *Massey vs. McIlvain,* 2 *Hill C. R.* 428. The case of *Burr vs. Burr,* 3 *Ves.* 573, 575, 581, is near to *Alexander's* claim. An agreement for a mortgage, a specific lien against creditors. *Exe'r of Polony & Read vs. Keenan et al.* 3 *Dessau,* 74. The same rules extend to personal property otherwise illustrated. *Young vs. Keighly,* 15 *Ves.* 557. *Read vs. Galliard, adm'r of T. Simons,* 2 *Dessau,* 552. *Dow et al. vs. Ker et al.* 1 *Spear,* 431, 418. *Fletcher et al. vs. Morey,* 2 *Sto. Rep.* 564. *Burn vs. Carvalho,* 4 *Mylne & Craig,* 690. *Aldridge & Higdon vs. Weems & Hall,* 2 *G. & J.* 36. *Thomas' Exe'r vs. Von Kapff's Exe'r,* 6 *G. & J.* 373. *Depeyster et al. vs. Gould et al.* 2 *Green,*

*N. J.* 481, 374. 2 *Sto. Eq.* 962, sec. 1503. *Minns vs. Morse et al.* 15 *Ohio*, 568. *Richardson vs. Stillinger*, 12 *G. & J.* 483. *Lempriere vs. Pasley*, 2 *Tenn. Reports*, 485.

The complainant is entitled to specific performance, as between parties. As to personal estate, *third* parties cannot object. The creditor has no superior right without a levy on personal property, and the insolvent law supercedes this. Moreover the judgment creditors have other liens. *Evertson vs. Booth*, 19 *John.* 492. Though the contract be not fully performed by *Alexander*, yet he might sustain a bill to protect such interest as he had acquired under his contract with *Ghiselin.* *Corse vs. Patterson*, 6 *H. & J.* 154.

By C. C. MAGRUDER for the appellees.

The appellees will insist that the court below properly dissolved the injunction in this case:—

1. Because the application of *Robert Ghiselin*, for the benefit of the insolvent laws, did not impair the lien acquired by his judgment creditors, by virtue of the executions levied upon his personal property, nor suspend their rights to enforce the said execution, by a sale of the property levied upon.

2. Because the agreement for security, relied upon by the complainants, is denied by the defendants, and if proven, could not prejudice them, being void under the statute of frauds.

3. The agreement between the said complainants and the said *Robert*, should not be specifically enforced, to the prejudice of the said judgment creditors, under the circumstances of the case.

4. That the benefit of the injunction should not be extended to the said complainants, as contended in their third point, to the prejudice of the said judgment creditors, or other creditors of the said *Robert*.

5. The complainants should have given an injunction bond, and their failure to do so was a sufficient cause for dissolving the injunction.

Under the act of 1805, ch. 110, sec. 7, the lien on personal property does not depend on the actual execution of the levy.

It flows from the judgment. The proceeds of all property of the insolvent, after satisfying all judgments, incumbrances, and liens, remain for all other creditors equally. It is the residue that is to be divided. But the execution process is to have some effect. It is something in addition to the judgment. By the execution levied, the creditor obtains a superior, a specific equity. A levy changes the nature of the property. The creditor obtains a qualified property. *Beatty vs. Chapline,* 2 *H. & J.* 19. *Hanson vs. Barnes,* 3 *G. & J.* 359.

The act of 1799, ch. 79, sec. 10, shows the effect of the injunction on the sheriff. Since the act of 1826, ch. 157, the property and person of the debtor are released by the injunction from the sheriff's control.

The injunction is not grantable without a bond—1835, ch. 346.

This parol contract is void. *Lammott vs. Gist,* 2 *H. & G.* 433. There was neither part performance, nor payment here, to take the case out of the statute of frauds. *Lacon vs. Mertins,* 3 *Atk.* 3. There was concealment here, which would prevent the complainants from taking the fund. *Bliss vs. Thompson,* 4 *Mass.* 488. The promise to give the mortgage was void. *Boyd vs. Stone,* 11 *Mass.* 342. The relinquishment of *R. G's* right to redeem the mortgage to *Mrs. G.,* cannot be proved by parol. *Scott vs. McFarland,* 13 *Mass.* 309. The terms of the contract are uncertain as to their extent; and equity will not specifically enforce it. *Harnett vs. Yielding,* 2 *Sch. & Lef.* 548.

Part performance under the statute of frauds. Payment of the purchase money is not sufficient part performance of a verbal contract for land, to take it out of the statute of frauds. *Jackson vs. Cutright & Clark,* 5 *Mumf.* 318.

There is a distinction between contracts to purchase and mortgage. The latter are not favored nor extended in equity, in view of the statute of frauds. *Ex parte Hooper,* 19 *Ves.* 477.

Intervening equities will arrest the court in granting specific performance. *Carberry vs. Tannehill,* 1 *H. & J.* 224.

To enforce this alleged contract under the circumstances, would nullify the act of 1729, ch. 8, which demands that mortgages of personal property to affect third parties, should be acknowledged and recorded within twenty days of their execution. The conditions of this act have not been complied with. *Dorsey vs. Smithson,* 6 *H. & J.* 61. *Hudson vs. Warner and Vance,* 2 *H. & G.* 415. *Moale & Johnson vs. Buchanan et al.,* 11 *G. & J.* 314. *Warnick vs. Michael,* 11 *G. & J.* 153. *Salmon vs. Claggett,* 3 *Bland,* 125.

By Wm. H. Tuck for the appellees, upon the 1st, 3d, and 4th points.

1st. The effect of the application and discharge upon the *fi. fas.,* actually levied before that time. An execution authorizes the sheriff to take property and make the debt. A seizure gives him a qualified property in the chattels—that is a property unaccompanied by a right to immediate possession. But yet he has a technical possession, on which he may maintain trespass or replevin. The character of this writ, and the powers and duties of the sheriff, are explained in—*Chapline vs. Beatty,* 2 *H. & J.* 15.

The judges in that case agree, that the sheriff has a property in the chattel, *special* to be sure; but for the purpose of making the debt, *Judge Gantt* maintains that each party, the sheriff and defendant, had a qualified property. That the defendant might sell or bequeath, subject to the sheriff's property. They all agree that the *fi. fa.* is one entire thing, and cannot be disturbed, except in particular cases provided for by the statute or common law. Thus an injunction did not release the property, although it suspended its execution, until 1799, ch. 79, sec. 10.

And as late as 1826, ch. 147, a defendant taken under *ca. sa.* was not discharged by injunction. Where the plaintiff or defendant dies, the execution may go on, although the property be returned in the inventory. This is by reason of the qualified property that the deceased has in the goods. If a defendant may sell, subject to the levy, what prevents the

deed to the trustee, passing a qualified interest; *it is but a deed at last* of all his estate in the property.

It is contended, that the possession, with an absolute title, must pass under the insolvent's deed, in virtue of act of 1805, ch. 110, sec. 5. But this does not necessarily follow. The words of that act, and of 1827, ch. 70, are technical, and have a technical meaning—the former uses PROPERTY, and the latter ESTATE. The last act prevails, and must be construed in a technical sense, as referring to the interest of the insolvent, and not to the body of the property. The insolvent cannot convey more than he enjoys himself; and the trustee takes the property, subject to the liens of others. In the cases in bankruptcy, mortgages, &c., the question may not have been raised. Suppose the case of a bill to sell mortgaged real estate, where the mortgagee is not a party, where would be the legal title under the sale? The title passes under a creditor's bill, because the mortgage creditor may come in, and these cases are provided for by law. But on general principles, the legal estate would be in the mortgagee.

The 7th sec. of 1805, ch. 110, does not necessarily suppose that the property passes to the trustee as matter of right. It only means that he shall pay off all liens, &c., as in a case in equity, where the incumbrancer may come in and take satisfaction from the property covered by his lien; or as the case of an administrator or executor, the sheriff may sell, and the plaintiff has a right to the benefit of the lien. Suppose a creditor, under a mortgage, has possession of the property, can the trustee take it from him? He may file his bill to redeem for the benefit of the creditors. What return can the sheriff make to a *fi. fa.* that will discharge him? In this case the return "*enjoined*" will do—but how, where there is no injunction?

The eligibility of this mode of exercising the power of sale—as to cash and credit. Who pays the expenses of this proceeding, the sheriff's fees and trustees' commission? A dissolution of the injunction was unnecessary, because the property had been discharged under the act of 1799, ch. 79,

sec. 10. That act provides that the property shall go back to the defendant. The court had no right to deprive us of the security we had in the sheriff's bond—and turn us over to that of the trustee. This may be immaterial; and if the case on motion to dissolve had gone against us, perhaps we should not have been here at this time. The appeal is just as unnecessary as the dissolution.

3rd POINT. 1st. Was there any agreement at all, as against *Ghiselin?*

2nd. As against his creditors, and especially the defendants.

What is a contract?—*Chitty on Contracts*, 15, 16, 26, 71. *Addison on Contracts*, 33, 4, 5, 6. 1 *Sumner*, 225. They must agree in the same sense, to the same thing. *Newland's Contract*, 151, 152, 224.

What is a contract as to *Mrs. Ghiselin?* She was to release as to $15,000.—*Did she do it?* The bill admits that she did not execute the deed to *Edmonson.* The answer shews that *Ghiselin* duly executed it. It was sent to him, says the bill, and remained in his possession. It was an entire contract, both as to her and *Alexander;* that is, he was to give the security when the $15,000 were raised, as a condition precedent, his object being to provide for his creditors. *Addison on Contracts*, 194. *Story on Contracts*, 8, 9. *Am. Jurist*, Oct., 1833, art. 3, p. 251. 3 *Bos. and Pull.*, 300. *Youqua vs. Nixon*, 1 *Pet. C. C. R.* 222. *Stansbury vs. Fringer*, 11 *G. & J.* 150. It is contended, that there can be an apportionment of this consideration; that is, that she is entitled to be secured to the extent of *Glenn's* mortgage. If the contract be entire, this is not so. Suppose she were suing at law for a breach of agreement by *R. G.*, must she not aver a performance, or an offer to perform all she agreed to do? There must be a contract set out, giving a cause of action on both sides. 4 *G. & J.* 467. It is said the bill of sale was the consideration—so it was; but to be delivered only on raising the $15,000—this was the entirety of the contract; and it was the chief inducement.

4th POINT. *Ghiselin's* answer. Then again, it is said the only condition, on her part, was to release her liens. It makes

no difference that the negotiation partly failed. She had nothing to do with raising the money; and she was not to clear the title, &c. She well knew that she was to have no bill of sale until she released for the whole amount—$15,000. There was no mistake, surprise or fraud practised on her. She knew all about it. *Mr. A.* was called in to make explanations, &c. And the question is not what she agreed to do, but what *Ghiselin* agreed to do? What was his understanding of the contract?

*Glenn's* answer is relied on to shew that all the papers were to be executed at the same time, as evidence of one entire contract; also on the dates, &c. We say it was an entire contract; but the mortgages were to precede the deed for the negroes—else why did not she call on *R. G.* soon after June, 1845? Why did not they complain of his delay? The answer says, that the security was to be given "*after such* $15,000 *should be raised and received, as aforesaid.*" But he denies, &c.

She claims the benefit of a part performance. She is not the only one unhappily connected with *R. G's* embarrassments. She had a security and she lost it,—*but by her own fault.* She should have withheld the deed to *Glenn,* until the other was executed, so that the bill of sale could be demanded under the contract.

She comes in equity relying on a part performance. In all these cases she must offer and be in a situation to perform the rest of the contract on her part. Here she cannot make the offer, because under the present circumstances, the contract cannot be completed. *Buchanan et al. vs. Lorman et al.,* 12 *G. & J.* 190. There is no averment in the bill, that $8,000 were raised on *Glenn's* mortgage, or that it was applied under the agreement. The answer of *Glenn* states that $8,000 were advanced and paid towards judgments *and other claims.* The answer of *Ghiselin* says, the money was to pay the *Bank* and judgments. What has become of the money? The *Bank* is not paid. It is not averred that judgments were paid. Perhaps it has been applied to the withdrawal of the

paper on which *Mr. A.* was liable?—and if so, it was against the agreement as understood by *Mr. Ghiselin.*

2d. Is there an agreement as to *Alexander?*  As to him, the first agreement (if any) entirely failed.  The Bill and answer shew that his security depended on *R. G's* raising the money. The bill states that after the letter of 3d October, 1845, he expected *another* deed *to be prepared,* and sent him.  This abandoned the first agreement.  The letter of *Ghiselin* by itself is no agreement, binding the negroes without an acceptance.  There is nothing to show that it was an acceptance by *R. G.* of an offer made by *Alexander.*  On the contrary, he declines giving a bill of sale, which it is insisted was the proposal of that letter.

The court will not enforce any alleged agreement, unless they can see that it was certain and mutual, and understood by the parties in the same sense.  19 *John.* 205.  12 *John.* 190. 1 *Sumner R.* 224.

The cases cited in argument were express and certain agreements in writing for particular security.  *Not demands for security generally.*  In all these cases, there was an agreement binding certain ascertained property.  We need not examine them, that is the fact.  The letter of *Alexander* demanded a sufficient and available security.  The answer says you shall be secured on the happening of an event.  Nothing is said here about negroes as the security.  He may as well claim an equity against all the property.  *Mr. A.* could have enforced this agreement against any property, if these negroes had been levied on before the letter.

It is reasonable to infer that he did not mean a bill of sale on his negroes, because they were *morally* pledged to the judgment creditors, and *Alexander* knew it, as appears by the answer.  *R. G.* had always refused this, unless they were paid.  A bill of sale would be ruinous, &c.  Any bill of sale would have the effect of bringing his creditors on him.  He may have meant a mortgage.  There is no consideration for the agreement set up in the letter.

The prior indebtedness is not sufficient.  This was a new

agreement for security. At law, as in equity, it must be mutual, and give each party a cause of action. Suppose *Alexander* were suing at law, what could he say as the consideration of the contract? Suppose the agreement had been, I will sell you the negroes for my debt? 7 *G. & J.* 404. If *R. G.* had complied, or were to offer to comply, what performance could he claim against *Alexander?* He says the consideration was forbearance in agreeing to postpone his claim for seven years, to *Glenn's* mortgage. He cannot be said to forbear doing what he had no design of doing. It is no where averred that he ever designed suing or taking any steps, until after this letter. The postponement by *Glenn's* mortgage was part of the original contract; and this was abandoned when he demanded a security on different grounds.

But he had nothing to do with this. It is not pretended that his assent was necessary to *Glenn's* mortgage. He was only called on to make explanations, &c., as counsel and friend of the family; and it was made through his intervention. The letter does not offer the security if he would wait longer. As to forbearance. *Chitty on Contracts,* 35. 1 *Penn. Rep.* 385.

He acquiesced in his proposal for further time. *Alexander* did not consider himself bound by any agreement to forbear, because he prepared his bill, and did not file it, because advised not to do so. The time of this does not appear, but it may have been shortly after Oct. 1845. He does not appear to have had any apprehension of his debt until Sept. 1845.

Another consideration alleged, is the receipt of $2,000 by *R. G.* This might make him a purchaser of the judgment he paid. He held this security at the time of the alleged agreement. It turned out to be available for $2000. By crediting *R. G.* again, he has lost it. Can he charge it against this property? If he had kept that security, his claim against these negroes would be $2000 less—or rather, he would have two securities, which would protect us *pro tanto.* But it is no where alleged that this $2,000 transaction formed an element of these agreements.

The money was received by *R. G.*, and paid away after the

letter of 3d Oct. was received. It was a new advance by *Alexander*, and not covered by any preceding agreement. How can that be made the consideration of a previous contract?

The receipt of the $2000 by *R. G.*, with *Alexander's* permission, was a payment of that sum of his claim for $6,000, (and on her loan for $2,000) as against third persons.

Is the contract to be enforced against the defendants?—execution creditors. He says, equity considers as done what is agreed to be done. And hence, because a bill of sale was agreed to be given, equity will treat the property as if it had been given. That is the general rule. But it will not be enforced against a party who has not been in default, or against those claiming under such a party. He who seeks equity must do equity. As to *Mr. Alexander's* lien, when did it become a lien?—conceding that he assented to the letter. Not until the negotiation had failed. When was this? The record does not show. Then our executions may have been levied before it failed; and the onus is on him to show that his lien attached before the executions. 11 *G. & J.* 326.

In the cases cited on the other side, there were clear and explicit agreements. In all the cases cited on our side, where there was any doubt, the court refused to establish them, as well as in those where there was any suspicion of unfairness. In *McMechen vs. Maggs*, 4 *H. & J.* 132, there was express notice of the secret lien. In *Aldridge vs. Hall & Weems*, 2 *G. & J.* 30, the agreement was written on the paper, *which did not require delivery*. *Woods vs. Fulton & Starck*, 4 *H. & J.* 329, creditors were not parties. *Tiernan vs. Poor*, 1 *G. & J.* 216. *Brundige vs. Poor*, 2 *G. & J.* 1, consideration was forbearance, and enforced against the parties only. 6 *G. & J.*, *Thomas vs. Von Kapff*, was an express agreement on record for the security. *Hampson vs. Edelen*, 2 *H. & J.* 64. *Repp vs. Repp*, 12 *G. & J.* 344. *Richardson vs. Stillinger*, 12 *G. & J.* 483, was a case of Vendor *vs.* Vendee, where the judge says, that all *such secret* or known equities would be enforced. But that is not this case. There are many reasons for the equity as

against a vendee, that do not apply against others. This was *arguendo* to, and applies to the particular case then before the court; otherwise it would contradict 11 *G. & J.* 314. That case goes on the ground of agreement, with possession. *We had no notice of this secret equity.* If we had, we might have saved ourselves, by taking other property.

4th POINT. As to the substitution. These creditors have no one to protect them. They are not parties. *Alexander's* duty as trustee is to protect all. We rejected the proposal of the counsel, because we have no power to bind the general creditors by our agreement. And besides, I do not perceive the fairness of making them assignees of judgments against the land, by the use of the trust funds. This substitution cannot take place here, because the general creditors are not parties. It may be done in insolvency.

By T. F. BOWIE, also for the appellees.

There is but one question here. The priority of *Mr. Alexander*, over the judgment creditors of *R. Ghiselin*. He claims under *Mrs. Ghiselin*, but his contract has no reference to hers. His demand is clear of hers. We represent the general creditors' defendants. The answers of *R. Ghiselin* and *J. Glenn* have no effect against us. One co-defendant cannot be evidence against another, under the circumstances here presented. The real defendants are the creditors of *Ghiselin*, against one who seeks to enforce an equity alleged to be superior to theirs. *Warfield vs. Gambrill*, 1 *G. & J.* 503. And this posture of the case excludes the answers of those co-defendants as evidence, who claim against the general creditors. As respects them, the court can only regard the bill and their answers.

If the complainant have no remedy against *R. G.*, he can have none against his creditors. It would be against conscience to enforce the contract against him. The nature of the alleged contract shows there can be no specific execution. *Alexander* was merely agent, not a contracting party in his own right, nor for himself. The contract was between *Mrs. G.* and her

son, and was to raise $15,000. She agreed to release him for treating *R. G.* as vendor. There is no breach on his part which would entitle his mother to specific execution. And as respects the mother, the contract was by parol. This was the agreement of June, 1845. The other complainant, *Alexander*, seeks to connect that contract with one of October, 1845, though nothing was added by *Mrs. G.* to the first.

Whether the agreement be in writing, or by parol, with part performance, still it must be specific and certain, both in terms and description of property. This is defective in both. It must be mutual in its stipulations. *Alexander* was not to advance a dollar. To do nothing but act as counsel. *Geiger vs. Green, Ms. Dec.,* 1846.

The contract was also indivisible in its nature, which is another ground against specific performance. *Hamilton vs Warfield,* 2 *G. & J.* 482. 13 *Ves. J.* 328. 1 *Sch. & Lef.* 32. *Prec. in Ch'y,* 560. 1 *Atk.* 12. *Stark's Ev.* 603, 612.

*Mrs. G.* has only in part performed this contract; and it became impossible for her, by her own default, to perform the residue. She was to raise $15,000, or give a lien in advance of her own, to that extent. She stopped at $8,000. *R. G.* was entitled to all the advantages of the contract, according to its stipulations. The permission to let *R. G.* collect $2,000 formed no part of *Alexander's* agreement. The original agreement did not call for it; and therefore, it cannot be relied upon, as an act of part performance.

To set this contract up, will be to divert the value of the negroes from all the general creditors.

The contract is void at law and in equity. It is so under the act of 1729, ch. 8, sec. 5, which declares, that no goods or chattels, whereof the vendor, mortgagor or donor shall remain in possession, shall pass, alter or change, or any property thereof be transferred to any purchaser, mortgagor or donor, unless the same be by writing, and acknowledged and recorded, &c. The act, however, not to extend to make void mortgages *against the mortgagor,* or those claiming under him. As respects *R. G.,* he cannot set up this act; but those who

claim against him may. The act was to remedy the effects of secret conveyances, as distinguished from recorded ones. This case is within the mischief of the act. It is not a case in which an effective registration would be decreed. *Mrs. G.* should not have released her lien until she got an acknowledged mortgage of the negroes to be recorded. The contract is void at law, and equity will not set it up. There is no pretence of notice to the creditors, which would make it inequitable on their part to resist. *Trumbo Ex. Neff vs. Blizzard & Jacobs,* 6 *G. & J.* 18. *Birely & Holtz vs. Staley,* 5 *G. & J.* 456. *Stockett vs. Ellicott,* 3 *G. & J.* 125. *Warnick vs. Michael,* 11 *G. & J.* 153. *Lamborn vs. Watson,* 6 *H. & J.* 252. *Moale vs. Buchanan et al.,* 11 *G. & J.* 326. *Woods et al. vs. Fulton & Starck,* 4 *H. & J.* 329. *Pannell & Smith vs. Farmers Bank,* 7 *H. & J.* 202.

By McMahon, in reply.

In the spring of 1845, *R. Ghiselin's* estate was covered by various liabilities. Mortgage in 1834 to his mother. Judgments in 1843 and 1844. In debt to *Alexander* $6,000, to pay off judgments. And also variously liable as endorser and acceptor. He opened a negotiation to pay off judgments; and in order to this, applied to his mother; and by contract with her, she agreed to waive her prior liens for an additional security on his negroes. *Alexander* knew all this, and willing to come in posterior to *Mrs. G.,* also desired security for his debt. He thereupon prepared three instruments, to be executed by *R. G.,* one to *Glenn,* one to *Edmonson,* another to *Mrs. G.* and himself. These he handed to *Ghiselin;* as to the instruments, he was to execute and retain them until called for. That to *Glenn,* was executed in June, 1845. *Alexander* had hoped to accomplish the entire negotiation; but it failed, and failed by default of *R. G.* During this period, *Alexander* wrote him, and received replies, in Sept. and October, 1845. After these letters, and in reliance on the original agreement, *Alexander* surrendered a security to him, which enabled him to enter a judgment satisfied. In October, *Ghiselin* sought relief from his creditors through the insolvent laws; and hence

this controversy between his unsatisfied creditors and the complainants.

On the question of latent equity, what is the general rule of courts of equity, in such cases as relates to sales and mortgages? The equity descends on all those who have no superior equity. *Massey vs. McIlvain*, 2 *Hill*, 428. Parties and privies are all bound. Agreements binding the conscience are enforced. *Dow et al. vs. Kerr et al.*, 1 *Spear*, 416, 417. General creditors are bound by a particular equity, if it affects their conscience. Administrators are bound. *Thomas' Ex. vs. Von Kapff*, 6 *G. & J.* 381. *Taylor vs. Wheeler*, 2 *Vernon*, 564. The bankrupt law in England does not interfere with this power. *Lempriere Assignees vs. Pasley*, 2 *D. & E.* 206, 210. *Mogg vs. Baker*, 3 *Mees & Wells Ex.* 195. *In the matter of Howe*, 1 *Paige*, 125. *Fletcher et al. vs. Morey*, 2 *Sto. Rep.* 564. The doctrine is, that with reference to assignees, they take subject to all agreements of this sort. Trustees are also so bound. *Burn vs. Burn*, 3 *Ves.* 575. *Young vs. Keighly*, 15 *Ves.* 557. *Hosford vs. Nichols*, 1 *Paige*, 226. The result is as far as general creditors are concerned, however possessed of the legal estate, they take subject to such equities. Parting with the legal title, the equity attaches to that title. This equity is only arrested by new contracts with the debtor in possession, creating particular equities. The law elects between the vendor and his new creditors. They are misled in such cases. They are ignorant of the secret trust. The new creditor to avail himself of the election, must be a very purchaser for full value without notice. She purchased with notice, there is an end of his equity, and he must purchase a legal title. A purchaser of the equitable title cannot avail himself of the legal title. The purchaser of the equitable title must take notice of prior equities.

Who gives the judgment creditor the lien? He proceeds *in invitum*. The law gives it. For what? Not for the land, but as an indemnity. Liens by operation of law, take only the interest of the debtor. 2 *Sto. Eq.* 962, *sec.* 1503, *note b*.

In England, a deposite of title deeds is an equitable mort-

gage. A creditor by execution takes the interest of the debtor. 2 *Sto. Eq.* 1502, *sec.* 1228. Lien for purchase money will prevail against a judgment creditor of vendee before conveyance. *Depeyster vs. Gould,* 2 *Green,* 481. As it regards judgment creditors, with or without notice, they take subject to equities. *Taylor vs. Wheeler,* 2 *Vernon,* 564. *Finch vs. Winchelsea,* 1 *P. Wms.* 277. *In the matter of Howe,* 1 *Paige,* 126, 127. *Ex. of Polony & Read vs. Keenan,* 3 *Dessau,* 77. *Massey vs. McIlvain,* 2 *Hill,* 428. *Minns vs. Morse,* 15 *Ohio,* 571. *Hampson vs. Edelen,* 2 *H. & J.* 64. A parol, secret, unrecorded, agreement, founded on value, would be enforced against a subsequent judgment creditor; if binding, he cannot sell the land. *Repp vs. Repp,* 12 *G. & J.* 341. *Richardson vs. Stillinger,* 12 *G. & J.* 483. A sale under *fi. fa.* would not affect secret equities.

We are, however, now dealing with personalty, where there is no lien until the execution reaches the sheriff, or at most, until it issues. It is a lien by the law, which shall not work any wrong. 2 *Sto. Eq.* 962, 1503. *State vs. Bank of Md.* 6 *G. & J.* 229. The courts cannot avoid prior equities by awarding executions.

I assume, independent of the acts of assembly, if this contract did create an equitable right, the complainants are entitled to enforce it.

Has the act of 1729 changed the rule or modified it? The difficulty arose in *Twyne's case,* how far conveyance without delivery was a badge of fraud. The possession of a mortgagor being consistent with the terms of a conveyance, did away the fraud. The act of 1729 made continuance of possession conclusive evidence of fraud in certain cases. The act gave the option to deliver up the property, or put your deed on record. Has this case any thing to do with that act? The unexecuted agreement could not be recorded.

Creditors trusting parties *after* incumbrance upon personalty, is the mischief under the act of 1729. That act nullifies the contract where parties are trusted after the agreement. Here they were all *prior* creditors, and not within the mischief. It

relates to actual conveyances of property. The other record-
ing acts show this. By the act of 1763, ch. 14, no estate
in slaves to pass, unless by deed recorded. A bond of con-
veyance could not be recorded until 1831, ch. 305. An agree-
ment for, is not a mortgage. Distinctions have been drawn in
other States between real and personal property. 1 *Kentucky
Laws*, 428. 4 *Am. Digest*, 389, *sec.* 5. The act of 1729,
meant to prevent frauds by parties to incumbrances; but where
a title must be pursued through equity, that was left untouched.
Courts would act in each case according to circumstances.
Creditors under the act of 1785, could not object to recording
such an agreement The registry laws have nothing to do with
equities. 2 *Powell Mor.* 624, *note o.* These acts do not
affect the fundamental principles of equity. *Hudson vs. War-
ner & Vance,* 2 *H. & G.* 429. *Pannell & Smith vs. Farmers
Bank,* 7 *H. & J.* 204. A mortgage for value is analogous to a
contract for sale. Security for a debt is likened to a purchaser.
*Sto. Eq.* 656, *sec.* 1229. In *Aldridge & Higdon vs. Weems &
Hall,* 2 *G. & J.* 36, a secret equity was enforced.

In *Moale & Johnson vs. Buchanan et al.* 11 *G. & J.* 314,
the complainants were only assignees for general creditors,
volunteers, not purchasers for value. The property assigned,
left out of the deed, and the case never relieved of the statute
of frauds, until the assignees took possession. When the
*Marine Bank* procured its lien, no right existed to enforce
the contract. The delay granted to *R. G.* was only prejudicial
to *Alexander.* There was no wrong in the original transaction,
and none since. It is as right now, as when it started.

How does the statute of frauds affect this cause? That does
not relate to all contracts affecting land. It must be an interest
in a sale of land, not a mere collateral agreement affecting it.
*Green vs. Vardiman,* 2 *Blackf.* 331. *Addison vs. Hack,* 2
*Gill,* 229.

The pleadings acknowledge the contract with *A.* and *Mrs.
G.,* and this takes it out of the statute.

Again, *R. Ghiselin* got a part of the consideration. He was
to do another act, raise a further sum. His was the first step

Alexander et al. *vs.* Ghiselin et al.—1847.

to be taken. Then *Mrs. G's* priority was to be waived. She was to release. Such was the order of executing the agreement. These are independent acts. At law, the contract would be enforced. *R. G.* got a part of the consideration, and could not stop. It would be unjust in him to keep what he has, without performing his part of the agreement. 1 *Wm's. Saund*, 320. As respects *Mrs. G.*, there was part performance, and readiness to perform the residue. *R. G.* was to convey the negroes for both *G.* and *A.*, on waiving the lien on the land. It was waived. No new interest in land is sought. The statute of frauds does not apply. It would be a fraud to refuse performance after what was done. The lien waived, cannot be resumed. 2 *Sto. Eq.* 77, *sec.* 760. *Ibid*, 96, 97, 99, *sec.* 771, 775. As to the consideration of the contract, there is abundant, as respects *Mrs. Ghiselin.* She waives in favor of all liens; comes in last; this puts her in danger; refuse her the personalty, and she has no lien but the ultimate one upon the land; and if that is not enough, she takes as general creditor only. 2 *Sto. Eq.* 656, *sec.* 1229.

*Mr. Alexander's* contract has also a sufficient consideration. If it was a nude pact, still it was followed by an act done upon the faith of it, to the injury or loss of another. *Train vs. Gold*, 5 *Pick.* 384.

There are two considerations. The original consideration, and the $2,000 after paid, or given up. All such agreements may be enforced against the general creditors.

Then as to the dissolution of the injunction. The bill is confessed. The creditors, in their answer, do not deny one fact in it. *Mr. Glenn* confesses he knew all about it. There is no latent equity about it. Upon a bill for specific performance, though the case is not fully admitted by the answer, still if enough of specific performance be admitted, the injunction which went with the bill will not be dissolved. 2 *Sto. Eq.* 94, 95, *sec.* 770. The drafts of the instruments were delivered on the express condition, that *Ghiselin* was to assign the negroes. He declines merely upon the ground of his insolvency. The letter of *Ghiselin* reflects light upon the antecedent transac-

tions, and is pregnant with the results relied on. *Bradley vs. Wash., Alex. & Geo. T. Steam Packet Co.*, 13 *Peters*, 98.

As to want of bond, *prior* to the injunction issued. The complainants have an equitable title, were no parties to the judgments, and not bound to pay the debt to the third party. 3 *Bland*, 615. 1835, ch. 346, sec. 3. 1835, ch. 384, sec. 4. The bond was, in the discretion of the Chancellor, to require or not. 1 *Bland*, 194. The execution creditors had no right to sell after the appointment of a trustee. The injunction killed the process; the execution was at an end. The act of 1805 places the property in the hands of trustee, for beneficial purposes, to be administered by one hand. It is admitted, the sheriff has a special property, subject to the general property. He may maintain trover, but the law may be changed, and this is what the act of 1805 has accomplished. There ought to be no divided administration. It is so under the bankrupt law of Congress, which is far short of our insolvent act of 1805.

CHAMBERS, J., delivered the opinion of this court.

The first objection to the continuance of the injunction in this case is, that the appointment of the trustee did not suspend the rights of creditors to enforce their judgments.

The 5th section of the act of 1805, ch. 110, provides that the insolvent shall convey to his trustee all the property he has in possession. The 7th section directs a sale to be made of all the property conveyed to the trustee, and applies the proceeds to general creditors, after satisfying all judgments, incumbrances and liens; but no judgment to be entered after the insolvent's application shall be a lien on his real property, nor shall any process against his real or personal property have any effect thereon, except writs of *fieri facias, actually and bona fide levied before such application.*

It is alleged that "the insolvent is to convey what he possesses," the receipt of which the trustee is to acknowledge, the trustee is to "sell what is conveyed," of course he is to sell only what the trustee has in his actual possession. If this be so, then the property in the hands of a tenant, a bailee, or a

trespasser, belonging to an insolvent, is not to be sold—-nor a mortgaged estate in possession of a mortgagee, although the mortgaged premises might be worth in a fair market, tenfold the amount of the debt: a construction which results in such conclusions cannot be adopted.

Again it is contended, that the provision, "no process against real or personal property shall have any effect thereon, *except* writs of *fieri facias*, actually and bona fide levied before such application," virtually asserts, that in the excepted case it shall have effect, and it is assumed that the sale by the sheriff must be the effect intended. This assumption is not warranted. The design of the law was to allow full force and effect to an execution levied as a *lien* or *incumbrance*, in connection with which words the process is mentioned, but not to determine, or in any manner to indicate, by whom a sale was to be made.

The true construction then of the act of 1805, and the supplementary acts relating to insolvent debtors, requires the trustee to take into his possession all the estate and effects to which the insolvent had the right of possession at the time of his application, and to sell and dispose of all his property, whether in possession, reversion, or remainder, and pay off the liens and incumbrances thereon, and to regard an execution as a lien upon personal property only in the case where it was actually levied before the insolvent's petition.

The effect is certainly an important one. In the case of personal estate, it secures to the execution creditor a priority over all judgments not in the same condition, by making his debt a specific lien on the property seized in execution. There may possibly be cases in which a priority might be acquired over other judgments or incumbrances of equal date, in respect to real estate.

The leading and general design of all bankrupt and insolvent laws, is to insure a prompt and complete settlement of all the affairs of the party, and an early distribution amongst the creditors, as nearly in equal proportions as a regard to positive and acknowledged preferences will admit. To facilitate these objects, our law has wisely given to the trustee, to be appointed

by the court, the entire management of the estate, subject of course to the control of the court by whom he is appointed, charging him with the duty of paying off liens and incumbrances, to which the estate might be subject. His duty requires him to make the earliest disposition and settlement regarding the interests of all the creditors—the particular lien creditor included—and brings all the claimants before one tribunal, whereas, by allowing sheriffs and mortgagees to participate in the administration of the trust, adverse interests are created, delays endangered if not ensured, and probably different, and possibly conflicting tribunals consulted.

The next ground of defence against the claim of the appellant, is that the agreement relied on in the bill, not being in writing, is void by the statute of frauds. If the assumption taken in the argument, that the alleged contract related to *land* as well as *personal* property, were well founded, it would be fatal. But the contract stated, and which the bill asks to have enforced, is an agreement to mortgage personal property alone. The debt was due from the party contracting, not the debt of another, and it was to be performed forthwith, so that the provisions of that statute do not affect it.

It is said however, that the registry acts, and particularly the act of 1729, ch. 8, make it void, as against creditors. This objection goes to the whole extent of the position, that an equitable mortgage cannot be enforced, except against the contracting party. No exception is made in the act, the terms of which are broad enough to defeat a bona fide purchaser, who has paid his money on the faith of a legal transfer or security, to be forthwith executed, if the rights of a creditor should happen to intervene, although the creditor had full notice of the transaction. There certainly is great difficulty in any general legislation on the subject, to avoid individual cases of serious hardship. The manifest injustice and oppression which a rigid execution of these registry acts according to their letter, would occasion, has led courts of equity to construe them as they have the statute of frauds, in a way to avoid many of the inconveniences and injuries which a literal

interpretation would inflict. How far in the aggregate the benefits of such a construction exceed the mischiefs, it is not the province of this court to decide. Wise and experienced jurists have differed in their opinions as to which would have been the more judicious course. All however agree, that a literal construction was not adopted, and to abandon at this period the precedents of all past time, would be to unsettle titles to property, destroy an entire system of chancery jurisprudence erected upon the supposed equity of these laws, and matured with the concurrence of many legislative enactments, and throw doubt and confusion over a large and important branch of the law, most intimately affecting the rights of every species of property.

Certainly it would be a novel doctrine in *Maryland*, to assert that the Chancery court cannot specifically execute a contract for a mortgage, or other equitable lien against creditors. The rule that "equity regards as done that which was agreed to be done," was imported with other parts of the system by our ancestors. The instances in which it has been enforced, and against the very terms of the registry acts, are numerous.

The every day occurrence of proceedings to enforce a conveyance bond, is a familiar instance. Who doubts the authority of a Chancery court to direct a conveyance, where the party in possession, under a bond of conveyance has paid the purchase money ; or that the title would prevail against creditors whose judgments were intermediate between the creation of the equitable title by the bond, and the legal title by the decree and deed? and yet our registry laws all the while declare that no estate in the lands for above seven years, shall pass, alter or change, except by a conveyance formally acknowledged and registered within a limited period.

Indeed, some of the appellee's solicitors did not deny that a written contract to execute a mortgage clearly expressed, made bona fide, and for full value, would raise an equity for the party claiming under such contract, that would prevail over the legal rights of creditors. The decisions of this court in the cases referred to at the bar, so clearly establish this doctrine that it

is impossible to doubt it. They object however, that this contract is not in writing. It is asked by way of answer to this objection, by what law is a written contract required? The equity is as great, all other considerations being equal, in the one case as the other. The danger of mistake, and the greater facility of obtaining false testimony in the proof of a verbal agreement, has occasioned statutory enactments, distinguishing them in certain enumerated cases. In all others they are on the same footing; personal property may be transferred in many instances, and the title pass by parol contract. We know of no decision which has asserted that a contract to execute a mortgage for personal property, may not also be by parol, except in the cases which the statute of frauds requires to be in writing. On the contrary, several of the cases cited were on parol contracts. See *Mogg vs. Baker*, 3 *Mees & Wels.* 195. *Massey & McIllvain*, 2 *Hill*, 421. *McMechen & Maggs*, 4 *H. & J.* 132. If the contract be as well established, it imposes the same moral and equitable obligation to perform it, when made verbally, as if made in writing, and the legal effect of the terms of the agreement will be the same in the one case as the other.

The greater difficulty of proving the precise terms and import of the agreement is necessarily incurred by the party setting it up, and courts of equity have properly required that every agreement shall be clearly and explicitly established, before they will lend their aid to enforce it.

A further objection to the contract alleged in this bill is, that it has not the certainty and explicitness required, so far as regards the alleged agreement with *T. S. Alexander*, and with regard to that, with *Mrs. Ghiselin* it was contingent, and that she has not performed the condition on which it was to depend.

And first, as to *Mrs. Ghiselin's* agreement: the statement is, that she held a clear mortgage, so far as it appears, the first incumbrance for $10,000 on the whole real estate, said to be worth $40,000: thus secured, she was prevailed on to agree that this incumbrance should be postponed, in favor of the individuals who were expected to loan the sum of $15,000 to

her son, to pay off and discharge the liens on his estate and other debts, on condition that she should receive as additional security, a mortgage on the negroes of her son. Two individuals had promised to loan this amount on receiving mortgages, to which hers should be postponed, and it was confidently anticipated by all, that the $15,000 would be procured on these terms. The deeds were prepared, as well the mortgages to the persons who were to loan the money, (one of which for $8,000, was executed both by *Mrs. Ghiselin* and her son) as the mortgage to *Mrs. Ghiselin* on the negroes. In this condition of things, the person who had agreed to loan the remaining $7,000, declined doing so, and the amount could not be and has not been procured.

In a court of law, a party claiming under a contract must claim according to its terms. If he venture to speculate on a contingency, over which he has no control, he must abide the issue, and if the event does not occur as he assumed, the contract is at an end. But even at law, if one party be prevented by the other from performing the contract, he can recover from that other by showing a performance of as much as it was permitted him to perform, and a readiness to perform the residue.

The rule in equity is much more broad, and permits a party specifically to enforce a contract, who has performed so much of it as to incur loss; if he is in no default for not performing the residue. The argument must assume that *Mrs. G.* was to procure a lender before she can be in default. Such certainly was not the case. Her contract was to release to the persons from whom her son was to procure the loan. If *Edmonson* had refused, and another person had been found by *Robert Ghiselin* willing to make the loan on the same terms, she was bound by her contract to release to such other person. But it was the office of *Robert Ghiselin* to find the lender, and it was his failure to do so, that made it impossible for her to release according to her contract.

She is therefore in the attitude of a party who has performed so much of the contract as it was possible, and ready

to perform the rest, but prevented from doing so, by the act of the other contracting party. This part performance has occasioned a postponement of her lien to the extent of $8,000; she is not therefore, as the authorities describe it, "in statu quo." To this extent, she is injured by her part performance, and is entitled therefore to a specific execution of the contract, or to such relief as in the altered condition of the property is equivalent thereto.

Then, as to *Alexander*, the statement of the · bill is, that being the son-in-law of *Mrs. G.*, and participating in the arrangement by which her former lien was to be waived, and her debt further secured by a mortgage on the negroes, and finding that his large claim would be postponed for many years, "he required, and *Ghiselin* agreed, that *Alexander* should likewise have a security and indemnity upon said negroes." The terms of this agreement do not seem to be vague or uncertain; a creditor in procuring from his debtor the security of a mortgage on his family of negroes, another creditor engaged in the arrangement, and finding mortgages given upon the land on a long credit, and a mortgage on the negroes for a still longer credit, and anticipating great delay in the payment of his debts, demands of the debtor "to give him indemnity and security on the same negroes," and the debtor agrees to do so. It is clearly a contract to secure the last named creditor by a mortgage on the same negroes, which were previously agreed to be mortgaged to *Mrs. Ghiselin*, and of course subject to her mortgage; so far then as this statement of the agreement is concerned, it is not subject to the exception taken. But it is said another contract is alleged, and a different one, in that part of the bill which is supposed to rely on the language of the bill of sale, as the contract. In regard to that transaction it is alleged that *Alexander*, at the request of *Robert G.*, prepared the deeds, including the mortgage of *Robert G.*, to both *Mrs. G.* and *Alexander*, of his stock of negroes, which mortgage was delivered to *R. G.*, and is filed as an exhibit in the cause. Now this is either a subsequent agreement, or it is not. If it be a subsequent agree-

ment it must supersede the first, as far as they differ; and then the agreement to execute this particular mortgage must be regarded as the subsisting and only contract between the parties. If it be so, and such is the correct view of the case, there is an end to the objection now discussed. Whatever reason may be urged against it, most clearly the want of sufficient certainty cannot.

If however, it be not regarded as a subsequent contract, then the effort to enlarge by the mortgage, the terms of the original agreement, will not render it more vague or uncertain than it was originally.

The question of consideration, so far as regards the agreement with *Alexander*, was alluded to in the argument, but chiefly in reference to any supposed contract, based upon the consideration of forbearance. Whether an existing creditor demanding specific security for his debt, and obtaining the promise of the debtor to comply, is to be considered in a court of equity, as favorably as a creditor, who at the moment of becoming a creditor, obtains a pledge for a specific security has been much agitated, and the decisions have not been uniform on the subject.

In *Burn & Burn*, 3 *Ves.* 573, a case is cited as having been decided both by the then Chancellor, *Lord Rosslyn*, and his predecessor, *Lord Thurlow*, in which the facts were these:— *Sir Simeon Stuart* being pressed by a creditor in his neighborhood, engaged by letter to " make him a mortgage upon some part of his *Hampshire* estates," and afterwards made a conveyance to trustees, for the payment of all his debts, and died leaving both general and judgment creditors, and without having executed the mortgage. It was held that the agreement to mortgage was to be regarded in equity as a mortgage from the date of the letter, and the debt was classed before the judgment creditors. The authority of that decision is sanctioned by sound reason. If a general creditor who has indulged his debtor on the faith of his ability to pay all his debts, shall commence the race of vigilance, as soon as the prospect of declining ability shall disclose the probable prudence

of a specific security, and by pressing his debtor does all he can to obtain a lien on a particular portion of his debtor's effects, how will justice or equity be violated by compelling the debtor to execute his agreement, if by accident or from unwillingness he has failed to comply with it, more than in the case of a party who relies on a similar agreement, and advances a consideration on the plighted faith of the other contracting party?

The existence of a debt is at law a consideration for an express promise, equivalent to the advance of an equal amount for the transfer of property, and certainly ought to be a sufficient basis in equity on which to rest an agreement, fair in all other respects, and will sustain an agreement by a debtor to give a specific lien to a creditor.

The late case of *Burn vs. Carvalho*, 4 *Myl. & Craig*, 690, fully confirms this doctrine. There the debtor having property in the hands of his agent abroad, agreed with his creditor to apply such property, or a sufficient part of it, to the discharge of his liability, and sent directions to his agent for that purpose, but became bankrupt before his instructions had or could have reached the hands of the agent.

The assignees of the bankrupt in an action of trover, recovered the goods which had been delivered subsequently to the commission, issued against the bankrupt. Yet the Vice Chancellor, and subsequently on appeal, Lord Chancellor *Cottenham* held the agreement to give the lien, and it was enforced against the creditors claiming under the commission.

It is by one of the solicitors particularly urged upon the court that the lien cannot in this case be made out against *Robert Ghiselin*, and hence he concludes it cannot possibly be enforced against the creditors. It is to be remembered that the case is now before the court on a motion to dissolve the injunction on the bill and the answers; that the answers are to be taken as true, so far as they affect the interests of the defendants respectively making them, and so far as they are responsive to the bill, and the statements of the bill are to be received as true so far as they are not denied.

It has been shown that the bill alleges an agreement sufficient to entitle the appellant to the aid of the court, if it be made out. It is conceded the answers of the other defendants, except *Ghiselin*, do not deny the agreement—they profess to know nothing on the subject, and rely on their legal and equitable rights.

The answer of *Ghiselin* in so many terms, admits " that the complainant *Alexander*, proposed, and he agreed to give him also a lien on his negroes as security for his debt," and also " that the various papers set forth in the bill, (amongst which, be it remembered, is the mortgage to *Mrs. Ghiselin* and *Alexander*) were prepared by said *Alexander*, at his (*R. Ghiselin's*) request ;" he alleges however, that the mortgage was to be a security for the debt, after the $15,000 should be raised and received as contemplated, and denies that he ever agreed to give such mortgage to the " prejudice of the *then existing* judgment creditors."

As against him, therefore, it would seem obvious, there must be an enforcement of the lien, so as not to affect judgment creditors being such at the date of the agreement—admitting what perhaps might well be doubted, that this part of the answer was strictly responsive, and *not* in avoidance. How far this restriction or qualification would, if proved, affect the case at any future stage of it, we are relieved from the necessity of considering, because the complainant *Alexander*, in person and as solicitor for *Mrs. Ghiselin*, has expressed to the court during the argument, their entire willingness to have such qualification attached to the agreement, and to claim their liens thereunder, subject to existing judgments, and allowing them a priority.

It appears therefore, that in the present position of the case, the bill being admitted by one defendant and not denied by the others, the agreement must be regarded by the court as subsisting. How far its existence subject to the prior rights of judgment creditors, would have entitled the appellants to claim a continuance of the injunction, is a question not necessary to discuss, because the injunction was proper on the other

Alexander et al. *vs.* Ghiselin et al.—1847.

ground, that is to say, the right of the trustee to administer the fund.

The only remaining objection is that an injunction bond was not filed. It is certainly proper as a general rule, very rarely, if ever to be departed from, that an injunction bond should be required when an application is allowed that delays the recovery or receipt of money, or which lessens or in any respect endangers any existing securities, or renders liable to loss thereby any money or profits, or property, which the adverse party is by the injunction prevented from receiving or enjoying. There should have been an injunction bond in the present instance, and on failure to file it before the injunction issued, the defendants in the court below could and should have applied by petition for an order requiring such bond to be given by a reasonable period, to be limited for that purpose, or, on default to have the injunction dissolved. Such a proceeding would still be proper, and would be directed in the court below, if the continuance of the injunction was dependent upon a question of fact or law yet to be established.

But whatever might be said, if there was any longer a doubt as to the issue of the application for an injunction, it would be an idle and perfectly useless form, and of course unnecessary now to require an injunction bond, because it is the direct result of the opinion above expressed, that the injunction, the only effect of which is to restrain the judgment creditors from proceeding to sell, must be perpetual, it being in all the answers admitted that the complainant *Alexander* is the trustee duly appointed under the insolvent law, and therefore having authority to take into his possession all the effects of the insolvent, and administer them as he must do, on the responsibility of his bond as trustee.

The case must however be remanded for the purpose of allowing further proceedings and such final decree as justice and equity shall require, upon proof to be taken in relation to the agreement alleged in the bill.

DECREE REVERSED AND CAUSE REMANDED.