WILLIAM F. JOHNSON, EXECUTOR, *v.* MARGARET PURNELL LONG ET AL.

[No. 28, April Term, 1938.]

*Decided May 19th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*William F. Johnson* and *Thomas F. Johnson,* for the appellant.

*Godfrey Child,* with whom was *George H. Myers,* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Thomas M. Purnell and Mary E. Purnell, his wife, lived in Snow Hill, Maryland, where Thomas M. Purnell owned and managed the Hotel Purnell, located at Washington and Green Streets in that town.

Washington Street, running in a northerly direction, intersects Green Street, which runs from southwest to northeast, and intersects Pearl Street, running parallel with Washington Street, and about 131 feet southwesterly therefrom. The hotel fronts on Washington Street, and between the rear of the hotel property and Pearl Street there is a lot fronting 65 feet and 10 inches on Green Street, and binding for 90 feet and 3 inches on the east side of Pearl Street, which was at one time owned by Levi Purnell, who died intestate, leaving as heirs a daughter, Mary E., the wife of Thomas M. Purnell, and two sons, Matthew and L. Wallace. Wallace also died intestate and his share became vested in Mary and Matthew. Matthew mortgaged his interest, the mortgage was foreclosed, and Thomas M. Purnell bought Matthew's share at the foreclosure sale. So that Thomas M. Purnell and Mary E. Purnell, his wife, owned the Levi Purnell lot as tenants in common, each owning an undivided one-half interest therein.

Mary E. Purnell died April 20th, 1924, leaving a last will duly executed and probated in ordinary course, in which, after certain bequests not material here, she left to Thomas M. Purnell a life estate in the whole residuum of her estate, and at his death the remainder over in trust to John W. Staton, to hold $10,000 for the use of Matthew during his life, and at his death to distribute it to his children, and failing children or descendants then to hold and distribute it as a part of the general residuum, and to hold that residuum for the use of Grace Purnell Long (now Tromley) during her life, and at her death for the use of her children and the children of any

deceased child until the "youngest of such children or child or children of any deceased child or children of the said Grace Purnell Long shall reach the age of twenty-one years," then to distribute the same to the child or children of Grace Purnell Long, and the child or children of any deceased child of hers, *per stirpes,* and in that will she named Thomas M. Purnell executor and trustee. So that from her death Thomas M. Purnell held in his own right an undivided one-half interest in the Levi Purnell lot, and, as life tenant and trustee of his wife's estate, the other undivided one-half interest.

In her devise and bequest to her husband, Mrs. Purnell used this language: "I give, devise and bequeath to my beloved husband, Thomas M. Purnell, if he should be living at the time of my death, for and during the term of his natural life, all the rest and residue of my estate, real, personal and mixed, and wheresoever situated, to have, use and enjoy the rents, incomes and profits therefrom so long as he shall live, in such manner and by such means as he shall see fit, with full power to my said husband to change the form of my investments as from time to time he may see fit, including the full power to sell without application or report to any court any part or all of my real estate and to convey the same to the purchaser or purchasers, without obligation on the purchaser or purchasers to see to the application of the purchase money, and from time to time in his discretion and as he may see fit, to invest and reinvest the proceeds of any such sale or sales, and to have, use and enjoy the income therefrom in such manner and by such means as he shall see fit; and having absolute faith and confidence in my said husband, I expressly declare that it is my intention by this item to give to him so long as he shall live the full and complete use, enjoyment and benefit of all said rest and residue of my estate, without any obligation or duty on him to account therefor to any person or persons, court or courts whatsoever, knowing that he will keep such personal accounts and records relating thereto that the trust hereinafter created to take effect at the death

of my said husband may become effective and my wishes as expressed herein may be carried out, knowing also that the same will meet with his approval; hereby creating my said husband Trustee of the said residue of my estate for his own use and benefit for and during his natural life, free from control or jurisdiction of any court or courts, person or persons, and without bond."

Thomas M. Purnell died February 8th, 1934, also testate. By his will he devised to Grace Purnell Tromley, his adopted daughter, for life, the Hotel Purnell property and the land used in connection therewith extending to the "American Stores Building," and at her death to her daughter Margaret Purnell Long.

In 1927 Thomas M. Purnell built a three-story brick annex to his hotel which extended some ten or twelve feet into the easterly part of the Levi Purnell lot, and in 1932 he erected on the westerly part of the lot a brick store and office building approximately thirty by ninety feet, and from that building to his hotel property he extended a brick wall along Green Street. As a result of those changes the easterly half of the lot was inclosed by the brick wall, the store building, and the hotel, part of it was occupied by the hotel annex, and all of it was used as part of the hotel property, while the westerly part was occupied by the store and office building.

In that situation, Margaret Purnell Long, by her mother and next friend, Grace Purnell Tromley, and Grace Purnell Tromley in her own right, filed the bill in this case, in the Circuit Court for Worcester County against Edmond H. Johnson, trustee under the will of Thomas M. Purnell, and William F. Johnson, executor of that will, to restrain the defendants from prosecuting a proceeding for the sale of the Levi Purnell lot as an entirety in lieu of partition. The theory of the bill is that Thomas M. Purnell, acting both as an individual and as trustee of the estate of Mary E. Purnell, effected an actual partition of the whole lot, under which that part of it occupied by the store and office building was allotted to the estate of Mary E. Purnell, and the remainder, which adjoins the

hotel property, which he owned in severalty, was allotted to him.

After the usual pleadings, testimony, and a hearing, the trial court adopted that theory, ratified the supposed partition, decreed the specific performance of a supposed contract to make the partition, and appointed a trustee to convey to the trustee of the estate of Mary E. Purnell the part of the lot allotted to that estate. This appeal is from that decree.

There are two questions in the case: One, had Thomas M. Purnell, as trustee under the will of Mary E. Purnell and as an individual, the power to divide in kind the Levi Purnell lot which he as an individual held as a tenant in common with himself as such trustee, so that as a result of the division he would hold as trustee for Mary E. Purnell's estate the part occupied by the store and office building, in severalty, and as an individual would hold that part adjacent to the hotel property in severalty; the other, did he in fact make such a division of the whole lot?

There is little real conflict in the evidence. Such as there is arises rather from the failure of the trustee to keep a clear separate account of his administration of the trust estate, than from any direct contradiction in the testimony of the witnesses. Nevertheless it is possible to have from all the evidence a reasonably complete understanding of his acts as trustee and their significance.

Purnell and his wife appear to have lived on terms of mutual confidence and trust. He was the head of the family. They had no children of their own, but they both were sincerely attached to an adopted daughter, Grace Purnell Tromley, and to her daughter Margaret Purnell Long. Purnell was the stronger character, his wife left the management of her property largely in his hands, and the confidence which in life she had shown in his judgment and integrity is manifested by the broad and irresponsible power which in her will she gave him to deal with her estate after her death. He

owned and managed the Hotel Purnell, and in that proprietorship he took a very real pride. Its management seems to have been his principal occupation; he was interested in its permanence, desired that it be maintained after his death, and was anxious to add to it such land and improvements as would in his judgment make it a complete and adequate hotel property.

The hotel building and a restaurant connected with it occupied so much of the lot on which it was located that not enough land was left for storage, service access, and ventilation. The only land available for the expansion of the property was the Levi Purnell lot which lay adjacent to it on the west. But while Purnell owned the hotel property in severalty, he owned only an undivided one-half interest in the Levi Purnell lot. He did not need the whole lot but only so much of it as was needed to complete the hotel property. Obviously therefore it was to his advantage to divide the property, alloting to each tenant in common approximately one-half of it in severalty. It is also apparent that such a division, if fairly made, would also be to the advantage of his cotenant, since a single owner could probably either sell or improve a vacant lot to better advantage than one owned in common with another.

There was no judicial partition of the property, however, nor was there any formal partition of it in any way; nevertheless, after his wife's death, Purnell by various acts *in pais* indicated an intention and a purpose of effecting a partition of the lot, in such a way that he would take in severalty that part adjacent to the hotel property, and he as trustee of his wife's estate would take the remainder.

In 1927 he built a three-story brick addition to the rear of the hotel, which extended some ten or twelve feet into the Levi Purnell lot. That addition was clearly valueless except when used as a part of the hotel, and yet unless Purnell owned it in severalty, it was possible that in the event of a sale of the whole lot in lieu of partition he would be deprived of it. As long as he lived

no such sale was likely to be made, but in his will he expressed the desire that the hotel be maintained after his death. The reasonable inference, then, is that when he thus encroached on the Levi Purnell land he believed that he had effected a division of it, and that he owned in severalty the eastern part of it.

In 1932 an opportunity occurred of utilizing the western part of the lot, binding on Pearl Street, if it could be improved by the erection thereon of a store and office building. The American Stores Company agreed that if such a store building were erected it would lease it for a term of five years. Mrs. Tromley urged Mr. Purnell to make the improvement. He replied that he himself had no money, but he did eventually build it, and it is sufficiently clear that he built it with money obtained from his wife's estate. Whether he did build it with money so obtained is the principal controverted issue in the case, but the evidence permits no reasonable conclusion other than he did.

Mrs. Purnell left an estate valued at $36,332.78. In 1927, Mr. Purnell as executor of his wife's estate stated a distribution account which charged him with a distributive balance of $36,692.63. That estate included among other securities certain bonds of the Town of Snow Hill, and there is testimony that Thomas M. Purnell, as such executor, held also other bonds of Snow Hill which were not included in the inventory. It also included three bonds of the Southern Transportation Company having a par value of $1,000 each. None of those securities were in his possession at the time of his death, and there is testimony which is not contradicted that some of them were sold to pay the cost of constructing the American Stores building.

S. Earl Tromley gave in part this testimony: "Did you hear him say about borrowing any money from any source whatever for the construction of the American Stores building and the adjoining office building? A. I heard him say he would have to sell some of Mrs. Purnell's bonds. * * * You know how he borrowed that?

A. Yes, sir, he put up some collateral—some Onancock bonds and Snow Hill bonds. You know whose bonds they were? A. From the records they were the bonds of Mrs. Mary E. Purnell. That was in 1933? A. Yes, sir. You know what became of those bonds? A. They were sold afterwards in order to pay the loan."

Mrs. Grace Purnell Tromley testified in part as follows: "You said a moment ago you were trying to persuade him to build it; he said he did not have the money —that probably isn't evidence—that he did not have the money. Do you know of your own knowledge, now—do you know with whose money that American Store was built? A. I know part of it. * * * Yes, sir, I do know. * * * Tell your knowledge? A. Well, I know that he sold some bonds of my mother's. * * * You have read into the record an inventory of bonds, so forth, belonging to your mother's estate in 1931; do you know which, if any, of those bonds were sold by your father? * * * A. Yes, sir. * * * How do you get that knowledge? A. She had some Snow Hill thousand dollar bonds—she had eight of them, and I know that he sold some of those. About when? A. Around that time. And they had some smaller denomination of Snow Hill bonds. What denomination? A. Oh, one hundred dollars or five hundred dollars."

The same witness later testified: "Mrs. Tromley, I believe that you have previously testified that after your mother's death you went to Baltimore on several occasions and clipped coupons? A. Yes, sir. Have you anything from which you can tell us, after your mother's death, how many $1000.00 Snow Hill bonds she had? * * * A. Yes, sir. I hand you these two papers, Mrs. Tromley, will you tell us what the one is that is written in lead pencil? A. This list was made after my mother's death, the first year that I was given power of attorney to go to the Fidelity Trust Company to make these separate lists and I found in my mother's box eight $1000.00 bonds. Of what municipality? What kind of bonds were they? A. Snow Hill $1000.00 bonds. You say that that memorandum was made by you at that

time? A. Yes, sir. And can you tell us about when it was? A. 1927, before we went to California. Do you have anything else? A. That coincides with the list made in my father's handwriting, where she had the eight $1000.00 Snow Hill bonds. You know when your father made that list? A. In 1926."

The testimony relating to Mr. Purnell's administration of his wife's trust estate is vague, sketchy, and unsatisfactory; nevertheless it was conceded by Mr. Edmond H. Johnson, trustee of the estate of Thomas M. Purnell, that "there was at least eleven thousand five hundred dollars less inventoried value, between what you received and what he reported in his inventory." Suggestions were made by Mr. Johnson that changes in the investments accounted in part for the discrepancy, but the suggestions had no apparent factual basis other than unsupported hearsay and conjecture. On the other hand, part of the discrepancy could be accounted for by the payments for the construction of the store building, which cost nearly $8,000, and, when that fact is considered in connection with the uncontradicted statement that Purnell had no funds of his own with which to build it, it must be assumed that it was built with funds obtained from his wife's estate. Assuming that to be true, and assuming too that he intended to deal fairly and faithfully with the trust estate, it must also be assumed that he would not have spent so much of the trust funds on the improvement of a lot in which he believed that estate had only a half interest. And while the conclusion is unavoidable that Mr. Purnell's administration of the estate was loose, careless, and informal, it is consistent nevertheless with entire good faith on his part. If, as the evidence indicates, he believed that he had so divided the lot as to give to the estate the part occupied by the store and the office building, the division was more than fair, because that was the most valuable part of the lot. Prior to 1932 the Levi Purnell property was partly inclosed by a board fence, but, when the store and office building were erected, that

fence on Green Street, from the office building to the hotel, was replaced by a brick wall, in which there was a gate which afforded access to the rear of the hotel property. In referring to that inclosure, S. Earl Tromley testified that Purnell had said to him that "the lot to the American Store line was part of the hotel property and that he would request that we never build anything on that because it was absolutely essential to the preservation of the hotel as an operating concern to have the rear end open for the hauling of ashes, garbage, and things of that sort out of the building. After he had built the American Store and office building in the rear of it, there was no way of hauling those things out of the building unless that lot was maintained as a vacant lot, and that ventilation was necessary for the kitchen of the hotel and it was necessary to haul those things in and out that way, and he had provided a gate there in that wall for that purpose. "Did he at any time mention anything about his will? A. He said he was leaving the hotel property to Mrs. Tromley for her lifetime and then to Peggy. And in connection with the hotel property, he said it extended to where? A. To the American Store line."

It is significant that in his will Purnell undertook to devise to Grace Purnell Tromley for life, "all of that property situated on Washington and Green Streets in said town of Snow Hill, known as the Hotel Purnell (which hotel name I desire to be maintained), together with the restaurant adjoining, with all furnishings and fixtures properly belonging to both, and all the land used in connection with said hotel extending to what is now the American Store Building; and that at the death of the said Grace Purnell Tromley, I give and bequeath the aforesaid properties to her daughter, Margaret Purnell Long, in fee simple, subject to the terms of the trust hereinafter created." It is also significant that in that will he made no other reference to the store and office property, although it was both profitable and valuable.

From these facts it must be assumed: (1) That Purnell intended to divide the Levi Purnell lot in kind between himself and his wife's estate; (2) that he did in good faith attempt to effect that intention; and (3) that he believed that he had effected it, and that he as trustee owned the store and office property in severalty.

But while these inferences are permitted, there is no evidence in the case that Purnell ever made any formal division of the property, or that he expressly stated at any time that he had divided it, but the partition, if it is to be found at all, must be inferred from his use of the land and of his wife's estate, and from his statements that the hotel property which he owned in severalty extended to the store and office building.

The question therefore is: Can the successor to or the beneficiary of one who held land in trust in common with himself as an individual acquire a valid title in severalty to a part of the common land by an implied parol partition, where the trustee was clothed with the powers conferred upon Thomas M. Purnell by the will of Mary E. Purnell in relation to said land?

It is stated in *Sowers v. Keedy*, 135 Md. 448, 451, 109 A. 143, 144, that "adjudications are abundant that, where there is a partition in fact between tenants in common and a part performance, a court of equity will have regard to and enforce such partition agreed to by the parties." And Mr. Tiffany, in his valuable work on *Real Property*, section 203, points out that such a partition is upheld in a majority of the states when followed by possession by several tenants of the portions allotted to them, but on varying grounds such as estoppel, the theory that it involves merely a severance of possession between the different owners and not a transfer of title, because it was not included within the scope of the statute of frauds, and because partition would be presumed from the conclusive possession by one tenant of a part of the premises for a considerable length of time. *Ibid.*; 20 *R. C. L.* 719, 721, notes 33, 34; 20 *R. C. L.* Suppl. 49. And in *Tiffany on Real Property*, sec. 203,

it is stated that: "A parol partition, followed by the taking of possession of their allotted parts by the various cotenants, has been upheld in courts exercising equitable powers on the ground that the partition is in effect an agreement for the mutual transfer of the various interests, and that the taking of possession constitutes such part performance as takes the case out the statute, and authorizes a decree for specific performance." But Mr. Tiffany adds: "Apart from those cases in which the parol partition can be made effective on equitable principles by an application of the doctrine of part performance, and having in view the generally existent requirement, either by force of the Statute of Frauds or other state statute, that an interest in land shall be transferred only by writing, it is somewhat difficult to understand how an oral partition can be regarded as effective." See, also, 47 *C. J.* 272, where it is said: "in order to justify enforcement in equity of a parol partition, it is indispensable that it should have been completed and accompanied by exclusive possession by each allottee of the part allotted him, and the partition must be established by clear and satisfactory evidence." In a note to section 14, *"Partition,"* 47 *C. J.*, cases illustrating the principle that equity will under appropriate circumstances ratify and confirm a parol partition are collected: "In a proper case (see *Equity*, sec. 92) courts will entertain a bill to confirm a parol partition where the agreement therefor is shown by clear and satisfactory evidence to be for a valuable consideration (*Tanner v. Tanner*, 326 Ill. 302, 157 N. E. 161); (2) reasonably certain as to the subject matter (*Tanner v. Tanner, supra*); (3) equitable and just (*Tanner v. Tanner, supra*); (4) and followed by possession (*Tanner v. Tanner, supra; Hill v. Hill*, 92 S. C. 204, 75 S. E. 401); (5) but if any one or more of these elements are absent, the partition will not be confirmed (*Tanner v. Tanner, supra; Hagen v. Anderson*, 317 Ill. 173, 147 N. E. 791; *Bayley v. Nichols*, 263 Ill. 116, 104 N. E. 1054); (6) as where the agreement was shown not to be fair and just (*Tanner v.*

*Tanner, supra*) ; (7) or where the only memorandum of the agreement was insufficiently intelligible to form the basis of the contract (*Hagen v. Anderson, supra*)." In *Miller on Equity Proc.* ch. 24, sec. 425, it is stated as a general rule that independently of any statute a court of equity has power to make partition.

Proceeding from those principles to the facts, it is apparent that the implication of a parol partition is affected by the facts that Purnell was a cotenant with himself in different capacities, as an individual, as life tenant, and as trustee, that there was no written memorandum of any partition, and by the principle that in each capacity he was entitled to possession of the whole property, and that unless his possession clearly excluded his cotenant, and was openly adverse and hostile to her interest, no inference of a partition may be drawn from it alone. *Venable's Syllabus*, 101; *Ross v. Phillips*, 148 Md. 165, 166, 129 A. 21; 62 *C. J.* 435 et seq., 443.

Tested by these rules, the suggestion that Purnell as an individual ousted Purnell as a trustee from any part of the common property has no real substance. As a life tenant he was entitled to the exclusive possession of the whole, so that no inference can be drawn from the fact that he used and occupied all of it exclusively. And apart from the powers conferred upon him by the will of Mrs. Purnell, it is not entirely clear that he had the power to divide the property, merely by agreement with himself as trustee, although it has been held that he did have that power. *Winthrop v. Minot*, 9 Cush., Mass., 405; *Ann. Cas.* 1912 C, 329.

Because of the peculiar relation of Purnell to the property, it is difficult to find in the facts stated the essential elements of a valid legal technical partition by parol or otherwise. They do support the inference, however, that Purnell in good faith intended to divide the property, that he believed he had divided it, and that he improved it with funds of the trust estate because he believed that it was owned in severalty by that estate. Indeed, any other inference would impute to

him a breach of trust wholly inconsistent with the evidence in the case.

But while the evidence fails to show a technical legal partition, it does not follow that the trust estate must lose the benefit of the division which Purnell intended to make and assumed he had made.

"Equity regards and treats that as done which in good conscience ought to be done" (Pomeroy Eq. Jur., sec. 364), and a court of equity will ratify that which was done without its authority, when upon application it would have ordered it to be done, if there is no other method of doing justice. Campbell v. Digges, 4 H. & McH. 12; Gray v. Lynch, 8 Gill 403; Tyson v. Mickle, 2 Gill 376; Reeside v. Peter, 35 Md. 220, 223; Alexander v. Ghiselin, 5 Gill 138, Brantly's Notes.

While there are decisions to the contrary, it has been held that a power to sell and exchange, or a power to dispose of and invest the proceeds, is sufficient to support a partition made under it. 20 R. C. L. 721; Note 92 Am. Dec. 127. Without adopting to their full extent the conclusions reached in those cases, the reasoning upon which they rest tends strongly to support the view that the powers granted to Purnell under the will of his wife were broad enough to permit him to divide the common property. And when it is considered that, by the decision which he intended to make, the most valuable part of the lot would have been allotted to the trust estate, it cannot be doubted that had application been made to a court of equity to authorize the division, authority to do so would have been given.

Nor can there be any doubt that, before Purnell as trustee spent nearly $8,000 of his wife's trust funds in erecting a building on the land which he and she had owned in common, that it was his duty as trustee to see that so much of the lot as the building occupied was allotted to her estate in severalty.

Upon the facts stated he was estopped from asserting any interest in or title to the store property, and the trustee of his estate, who holds Purnell's property sub-

ject to the same equities that affected it in Purnell's hands, is likewise estopped by the same principles of justice and equity which would have prevented Purnell from claiming any personal interest in the store property. *Stallings v. Ruby's Lessee*, 27 Md. 149, 156; 21 *C. J.* 1181; 20 *R. C. L.* 722. The notion that Purnell agreed to partition the lot is a mere metaphysical abstraction, for while he acted in three capacities he had only one mind, but his conduct amounted to an implied declaration that he would divide the property, and his use of it did effect in fact a practical equitable division of it. So that while the court could not decree the specific performance of a contract, because strictly speaking there was no proof of a contract, it had the power to ratify and confirm that attempted division, and to direct such acts and proceedings as might be necessary to vest the legal title to the store and office property in the trustee of the estate of Mary E. Purnell. So much of the decree therefore as determines that said trustee has an equitable title to the land occupied by that building, and directs its legal conveyance to the trustee of Mrs. Purnell's estate, will be affirmed, and so much of it as directs a specific performance of a supposed contract, since it is not necessary to the relief granted, will be disregarded as surplusage.

*Decree affirmed, with costs.*